UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>       v.<br><br>MICHAEL RUSSO, Assistant Attorney General in Charge, Buffalo Regional Office, in his official capacity; STATE OF NEW YORK; KATHY HOCHUL, Governor of New York, in her official capacity; LETITIA JAMES, Attorney General of New York, in her official capacity,<br><br>    Defendants. | Case No.: 1:26-cv-01283<br><br><br><br><br>Honorable Lawrence J. Vilardo<br>United States District Judge |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    I.    Governing Principles ................................................................................................ 2

    II.    Factual Background ................................................................................................. 4

    III.    The Challenged New York Laws ............................................................................ 7

LEGAL STANDARD ........................................................................................................... 8

ARGUMENT ........................................................................................................................ 9

    I.    The United States Has Pre-Enforcement Standing ................................................. 9

    II.    The United States is Likely to Succeed on the Merits of its Claims Against the Face Covering, Identification, and Termination Acts .............................................11

        A. New York's Face Covering and Identification Acts Violate Principles of Intergovernmental Immunity ...................................................................... 12

            1.    New York's Face Covering and Identification Acts Regulate the Federal Government .................................................................................... 13

            2.    The Termination Act Regulates the Federal Government ......................................... 14

            3.    The Termination Act Discriminates Against the Federal Government ..................... 16

        B.    The Termination Act Unlawfully Impairs the Federal Government's Contracts .......... 17

        C. The Termination Act Unlawfully Creates an Obstacle to the Enforcement of Federal Law and the Cooperative Scheme Congress Enacted ............................................................... 20

    III.    The United States Faces Irreparable Harm Absent Preliminary Relief ........................ 21

        A.    The Face Covering and Identification Acts Irreparably Harm the United States ......... 21

        B.    The Termination Act Irreparably Harms the United States ......................................... 23

    IV.    The Balance of Hardships and the Public Interest Favor the United States ................. 24

CONCLUSION .................................................................................................................... 26

**TABLE OF AUTHORITIES**

**Cases**

*A.H. v. French*,
985 F.3d 165 (2d Cir. 2021) ................................................................................. 24

*Am. Fin. Servs. Assn. v. Burke*,
169 F. Supp. 2d 62 (D. Conn. 2001) ..................................................................... 24

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ..................................................................................... 9

*Arizona v. California*,
283 U.S. 423 (1931) ............................................................................................. 12

*Arizona v. United States*,
567 U.S. 387 (2012) ................................................................................ 1, 3, 4, 20

*Arizona v. Yellen*,
34 F.4th 841 (9th Cir. 2022) ................................................................................ 10

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ............................................................................................... 9

*Blackburn v. United States*,
100 F.3d 1426 (9th Cir. 1996) ............................................................................. 12

*Chamber of Com. of U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) ............................................................................. 25

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) .................................................................................. 20

*Clark v. Suarez Martinez*,
543 U.S. 371 (2005) ............................................................................................... 3

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) .................................................................... 12, 13, 15

*Dawson v. Steager*,
586 U.S. 171 (2019) ............................................................................................. 16

*Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*,
459 U.S. 400 (1983) ....................................................................................... 17, 19

*Geo Group, Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) ................................................................................ 15

*Glidedowan, LLC v. New York State Dep't of Health*,
768 F. Supp. 3d 503 (W.D.N.Y. 2025) ............................................................... 24

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) ............................................................................... 12, 14

*Hancock v. Train*,
426 U.S. 167 (1976) ..................................................................................... 13

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ........................................................................................ 20

*Johnson v. Maryland*,
254 U.S. 51 (1920) ........................................................................................ 13

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ......................................................................................... 9

*Mastrio v. Sebelius*,
768 F.3d 116 (2d Cir. 2014) ............................................................................ 9

*Mayo v. United States*,
319 U.S. 441 (1943) ............................................................................... 12, 14

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ................................................... 12, 15, 23

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*,
491 U.S. 350 (1989) ..................................................................................... 21

*New York v. Tanella*,
374 F.3d 141 (2d Cir. 2004) ....................................................................... 22

*New York v. United States Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) ........................................................................... 8

*Nken v. Holder*,
556 U.S. 418 (2009) ....................................................................................... 8

*North Dakota v. United States*,
495 U.S. 423 (1990) ............................................................................... 12, 14

*Pub. Utils. Comm'n of State of Cal. v. United States*,
355 U.S. 534 (1958) ..................................................................................... 16

*Rowe v. N.H. Motor Transp. Ass'n*,
552 U.S. 364 (2008) ............................................................................... 23, 24

iv

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) ..................................................................... 25

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ............................................................................... 9

*Steffel v. Thompson*,
   415 U.S. 452 (1974) ............................................................................... 9

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ........................................................................... 9, 10

*Sveen v. Melin*,
   584 U.S. 811 (2018) ............................................................................. 17

*Tennessee v. Davis*,
   100 U.S. 257 (1879) .......................................................................... 2, 13

*Tweed-New Haven Airport Auth. v. Tong*,
   930 F.3d 65 (2d Cir. 2019) ...................................................................... 9

*U.S. Tr. Co. of New York v. New Jersey*,
   431 U.S. 1 (1977) ............................................................................ 18, 19

*United Healthcare Ins. Co. v. Davis*,
   602 F.3d 618 (5th Cir. 2010) ................................................................ 18

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) ............................................................. 24

*United States v. Alas*,
   63 F.4th 269 (4th Cir. 2023) .................................................................... 4

*United States v. California*,
   173 F.4th 1060 (9th Cir. 2026) ........................................................ *passim*

*United States v. California*,
   819 F.Supp.3d 1109 (C.D. Cal. Feb. 9, 2026) ....................................... 17

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ...................................................... 15, 17, 24

*United States v. City of Arcata*,
   629 F.3d 986 (9th Cir. 2010) ................................................................ 13

*United States v. Connecticut*,
   566 F. Supp. 571 (D. Conn. 1983) ........................................................ 21

*United States v. Connecticut*,
  742 F.2d 1443 (2d Cir. 1983) ................................................................................... 21

*United States v. Connecticut*,
  465 U.S. 1014 (1984) .............................................................................................. 21

*United States v. Connecticut*,
  465 No. 3:26-cv-758 (D. Conn. May 15, 2026) ........................................................ 24

*United States v. Fresno Cnty.*,
  429 U.S. 452 (1977) ................................................................................................ 23

*United States v. Raines*,
  362 U.S. 17 (1960) .................................................................................................. 20

*United States v. Sosa-Carabantes*,
  561 F.3d 256 (4th Cir. 2009) ...................................................................................... 4

*United States v. Virginia,*
  No. 3:26-cv-545 (E.D.V.A. June 11, 2026) .............................................................. 24

*United States v. Town of Windsor,*
  765 F.2d 16 (2d Cir. 1985) ............................................................................... 12, 14

*United States v. Washington*,
  596 U.S. 832 (2022) ................................................................................................ 16

*Vitagliano v. Cnty. of Westchester*,
  71 F.4th 130 (2d Cir. 2023) ...................................................................................... 9

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
  529 U.S. 765 (2000) ................................................................................................ 10

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................................... 8

**Constitutions**

U.S. Const. art. I ................................................................................................. 11, 17

U.S. Const. art. II ...................................................................................................... 3

U.S. Const. art. IV ................................................................................................... 11

**Statutes**

5 U.S.C. § 301 ........................................................................................................... 2

5 U.S.C. § 5901 ................................................................................................. 3

6 U.S.C. § 211 .................................................................................................. 2

6 U.S.C. § 252 .................................................................................................. 2

8 U.S.C. § 1103(a)(2) ....................................................................................... 3

8 U.S.C. § 1357(g) ................................................................................... *passim*

28 U.S.C. § 509 ................................................................................................ 3

28 U.S.C. § 531 ................................................................................................ 2

29 U.S.C. § 668 ................................................................................................ 3

N.Y. Civ. R. Law § 100 .............................................................................11, 26

N.Y. Civ. R. Law § 100(1) ............................................................................. 13

N.Y. Civ. R. Law § 100(2) ..............................................................................11

N.Y. Civ. R. Law § 101 .................................................................................. 26

N.Y. Civ. R. Law § 101(1) ........................................................................ 7, 13

N.Y. Civ. R. Law § 101(2) ........................................................................ 7, 14

N.Y. Civ. R. Law § 102 .................................................................................. 26

N.Y. Civ. R. Law § 102(1) ........................................................................ 7, 13

N.Y. Civ. R. Law § 102(2) ........................................................................ 7, 13

N.Y. Civ. R. Law § 102(3) ............................................................................... 7

N.Y. Civ. R. Law § 102(5) ........................................................................ 7, 14

N.Y. Crim. P. Law § 2.15 ................................................................................11

N.Y. Exec. Law § 170 ............................................................... 8, 17, 18, 26

N.Y. Penal Law § 70.15 .............................................................................. 7, 14

**Regulations**

8 C.F.R. § 287.1(g) ........................................................................................... 4

8 C.F.R. § 287.5(c) ........................................................................................... 4

**Other Authorities**

2 J. Story, Commentaries on the Constitution, § 1099 (1858) ....................................................... 23

Budget Act, McKinney's Session Laws of N.Y., ch. 55, § S. 9005-C ........................................... 1

Pub. L. No. 104-208 .................................................................................................................... 3

Reorganization Plan No. 2 of 1973, Pub L. 93-253 ....................................................................... 2

**INTRODUCTION**

On May 27, 2026, New York Governor Kathy Hochul signed SB9005-C (the "Budget Act") into law, which runs afoul of the Constitution and tramples on the Federal Government's congressionally mandated authority to enforce the immigration laws. Budget Act, McKinney's Session Laws of N.Y., ch. 55, § S. 9005-C. *See Arizona v. United States*, 567 U.S. 387, 394 (2012). One section of the Budget Act amends New York Civil Rights Law to add §§ 100-02; § 101 attempts to ban federal law enforcement officers from wearing facial coverings in many circumstances (the "Face Covering Act"), and § 102 purports to command federal law enforcement officers to wear visible identification (the "Identification Act"). Budget Act, McKinney's Session Laws of N.Y., ch. 55, § S. 9005-C. Violations of either the Face Covering or Identification Acts result in criminal penalties, including jail time. *Id.* Both provisions take effect June 26, 2026, potentially subjecting Federal officers to criminal charges.

Another section of the Budget Act amends New York Executive Law to add § 170-k (the "Termination Act"), which terminates existing and future agreements pursuant to 8 U.S.C. § 1357(g) ("287(g) agreements") and goes into effect August 25, 2026. The Face Covering, Identification, and Termination Acts (the "Challenged Acts") violate principles of intergovernmental immunity and are invalid under the Supremacy Clause because they unlawfully regulate or discriminate against the Federal Government. *Id.* Moreover, the Termination Act violates the Contract Clause and is preempted by federal law. The United States therefore moves this Court for a preliminary injunction prohibiting New York and its officials from enforcing these unconstitutional laws against the Federal Government—in the case of the Face Covering and Identification Acts an injunction is sought by June 26, 2026; as to the Termination Act, an injunction is sought no later than August 25, 2026.

Motion for Preliminary Injunction               - 1 -

New York's constitutional violations and consequent injuries to federal sovereignty alone establish irreparable harm. But additional harms to the United States will result as well. If forced to comply with these laws, the safety of federal agents will be placed at risk and law enforcement operations will be compromised. Meanwhile, if agents do not comply, they risk criminal prosecution. Moreover, the United States will be prohibited from engaging in cooperative agreements with local entities as expressly contemplated by Congress, and New York will invalidate existing agreements that greatly assist federal law enforcement. Finally, the balance of equities favors an injunction: Defendants have no interest in unconstitutional laws that endanger federal officers, impede law enforcement, undermine public safety, and vitiate voluntary agreements. The United States is therefore entitled to a preliminary injunction.

## BACKGROUND

### I.    Governing Principles

#### A. Federal Law Enforcement

The President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3. The authority to discharge that duty "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Federal law enforcement agencies, including those within the Departments of Justice ("DOJ") and Homeland Security ("DHS"), are created by federal law. *See, e.g.*, 28 U.S.C. § 531 (Federal Bureau of Investigation ("FBI")), 6 U.S.C. § 252 (U.S. Immigration and Customs Enforcement ("ICE")); 6 U.S.C. § 211 (U.S. Customs and Border Protection ("CBP")); Reorganization Plan No. 2 of 1973, 38 F.R. 15932, 87 Stat. 1091, as amended Pub. L. 93–253, §1, Mar. 16, 1974, 88 Stat. 50 (Drug Enforcement Administration ("DEA")).

To achieve their respective goals, the heads of each agency have the power to govern the agency's affairs and direct their agents' activities. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head

Motion for Preliminary Injunction                    - 2 -

of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the DOJ in the Attorney General); 8 U.S.C. § 1103(a)(2) (authorizing the Secretary of Homeland Security to "control, direct[], and supervis[e]" all DHS employees). Included within that power to govern the agencies is the power to determine how agents must conduct themselves when engaged in official duties in accordance with federal law. Federal law similarly empowers the Executive to provide for and dictate federal law enforcement officers' uniforms and equipment when carrying out their official duties. *See, e.g.*, *id.*; 5 U.S.C. § 5901 (directing the head of each federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 (requiring heads of federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees).

### B. Cooperative-Enforcement Agreements Under 8 U.S.C. § 1357(g)

Congress recognized that cooperation with state and local law enforcement is essential. *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). Congress added Section 287(g) to the Immigration and Nationality Act ("INA") (codified at 8 U.S.C. § 1357(g)) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) to help further that cooperation in the immigration sphere. Pub. L. No. 104-208, div. C, sec. 113, 110 Stat. 3009, 3009–546 (1996). Under Section 287(g) agreements, qualified state and local officers designated by the Secretary of Homeland Security[1] may perform specified immigration-enforcement functions relating to investigating,

---

[1] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean the Secretary. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

apprehending, and detaining aliens. 8 U.S.C. § 1357(g)(1)–(9); *see also Arizona*, 567 U.S. at 408-09. Section 287(g) requires that the specified officers "have knowledge of, and adhere to, Federal law" relating to immigration enforcement and that they receive "adequate training regarding the enforcement of relevant Federal immigration laws." 8 U.S.C. § 1357(g)(2); *see also United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023); *Arizona*, 567 U.S. at 409 (citing § 1357(g)(2); 8 C.F.R. §287.5(c) (arrest power contingent on training), *id.* § 287.1(g) (defining the training). This provision specifies that in enforcing immigration laws, the state or local officer "shall be subject to the direction and supervision of the [Secretary]." 8 U.S.C. § 1357(g)(3); *see United States v. Sosa-Carabantes*, 561 F.3d 256, 257–58 (4th Cir. 2009). "In short, Section 287(g) 'permits ICE to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement,' and 'ICE trains the local law enforcement officers who participate.'" *Alas*, 63 F.4th at 274 (quoting *Sosa-Carabantes*, 561 F.3d at 257). Congress thus expressly contemplated and approved the use of voluntary agreements with local law enforcement to implement federal immigration detention operations.

## II.    Factual Background

Federal law enforcement officers across the federal government, including the FBI, DEA, ICE, and CBP, face serious personal risks on a daily basis, and forced disclosure of their face or identity can lead to unwarranted attention, threats, or harassment, or endanger their lives or physical safety. Exhibit A, Declaration of Matthew W. Allen ("Allen Decl.") ¶ 13; Exhibit B, Declaration of Allen Davis II ("Davis Decl.") ¶ 16; Exhibit C, Declaration of Justin Hargis ("Hargis Decl.") ¶¶ 6-12; Exhibit D, Declaration of Bryan Flanagan ("Flanagan Decl.") ¶ 46. These risks multiply when officers or agents have their personal identifying information exposed on the internet and there is a "a real threat that third parties will access the information, engage in data

mining, identity theft, and other crimes, and seek to inflict violence on" federal officers and their families. Davis Decl. ¶ 15. Threats are especially prevalent towards federal immigration officers, who face harassment and retaliation simply for doing their jobs. Flanagan Decl. ¶¶ 30-39. For example, over the last few years, assaults against CBP officers escalated from 457 officers in Fiscal Year (FY) 2024 to 1,164 officers this FY as of April 2026. Hargis Decl. ¶ 6. Federal officers and even some federal employees have had their identities, schedules, and addresses exposed with direct threats online and in-person. Hargis Decl. ¶ 9(a)-(m), Flanagan Decl. ¶¶ 37-46.

Requiring identification and banning face coverings also enhances risks to officer safety in future undercover operations, as exposed personally identifying information such as facial features and names from a previous operation can be used to expose law enforcement activity in other future sensitive operations. Davis Decl. ¶¶ 15-18, Allen Decl. ¶¶ 15-18, Flanagan Decl. ¶¶ 45-53. That exposure increases risks to the safety of federal officers or their families, and increases risk that operations would be obstructed or that suspects could escape. Allen Decl. ¶¶ 16-19, Flanagan Decl. ¶¶ 45-53, Davis Decl. ¶¶ 15-18. Drug Cartels even have a bounty program with payouts escalating based on the rank and actions taken against federal officers, ranging from $2,000 for intelligence up to $50,000 for assassination. Flanagan Decl. ¶ 36. Federal law enforcement officers have been targeted for harassment, assault, and murder. Davis Decl. ¶ 16. Because of this serious threat to their safety, agencies permit federal officers to protect themselves by removing identification or wearing masks to protect their identities in certain circumstances, especially during high-risk enforcement operations. Flanagan Decl. ¶¶ 40-42. Since federal agencies know about the latest threats posed to their personnel and their families, federal agencies have an active interest in determining when officers can use facial coverings and when identification is required. *See, e.g.*, Hargis Decl. ¶¶ 16-18, Davis Decl. ¶ 19, Allen Decl. ¶¶ 19-21, Flanagan Decl. ¶¶ 47-55.

Motion for Preliminary Injunction                    - 5 -

Additionally, the Federal Government has been entering into 287(g) agreements with New York law enforcement for many years, with the oldest current agreement in the state dating to 2020. Ex. 1 to Flanagan Decl. As of June 2026, New York has fourteen 287(g) agreements throughout the state. Flanagan Decl. ¶¶ 19-35. Twelve agreements are in the Buffalo Area of Responsibility, and two agreements are in the New York City Area of Responsibility. *Id.* at ¶ 26. The partner agency must nominate candidates for 287(g) training, after which approved candidates are then trained by ICE. Once the candidate completes training at ICE expense, the candidate is certified and authorized to perform specified immigration officer functions under the direction and supervision of ICE. *Id.* ¶ 23-24; 8 U.S.C. § 1357(g)(8). Cooperation under the 287(g) program occurs under color of federal authority, not state authority. 8 U.S.C. § 1357(g)(8).

There are three categories of agreements: Task Force Model ("TFM"), Warrant Service Officer ("WSO"), and Jail Enforcement Model ("JEM"). Flanagan Decl. ¶ 23-24. Some localities have a combined WSO and TFM agreement. *Id.* at ¶ 23. TFM agreements enable law enforcement agencies to enforce limited immigration authority while performing routine police duties or as part of an ICE-led taskforce; WSO agreements allow officers to serve and execute administrative warrants on aliens in their custody; and JEM agreements enable the identification and processing of removable aliens who have pending or active criminal charges in state or local custody. *Id.* ¶ 23-24. In 2026 alone, for example, 287(g) agreements in New York have directly resulted in the arrest or safe transfer to ICE custody of illegal aliens charged with rape, arson, assault, and white-collar crimes who otherwise may have been released to the public. *Id.* ¶ 35. These agreements enhance safety for the public and for officers, and terminating them will significantly decrease information sharing, permitting the release of dangerous criminal aliens back into communities and increasing ICE's use of at-large enforcement operations and arrests. *Id.* ¶¶ 30-34.

Motion for Preliminary Injunction                - 6 -

### III.    The Challenged New York Laws

Governor Hochul signed the Challenged Acts into law in New York on May 27, 2026. Both the Face Covering and the Identification Acts apply to local, state, and federal law enforcement, impose criminal penalties on offenders, including potential jail time, and take effect on June 26, 2026. *See* N.Y. Civ. R. Law §§ 101(2), 102(5) (McKinney); N.Y. Penal Law § 70.15 (McKinney).

The Face Covering Act prevents law enforcement officers, including federal officers, from "wear[ing] any face covering that conceals, disguises, or obscures their facial identity while interacting with the public in the performance of their duties." N.Y. Civ. R. Law § 101(1) as amended by SB9005-C. "Face covering" includes "any item that is used to conceal, disguise, or obscure the facial identity, including any opaque mask, garment, helmet, headgear, balaclava, ski mask, neck gaiter, or tactical mask." *Id.* § 100(1). While "face covering" excludes several types of attire, including religious headgear or coverings worn for occupational health reasons, the exclusions do not cover items of common use to federal officers. Further, it appears that the State of New York solely decides whether and when these exceptions apply.

The Identification Act requires uniformed law enforcement, including federal officers, to visibly display . . . the name of the agency or department employing such officer; and . . . at least one form of identification of the officer, such as the officer's name, badge number, or shield number." *Id.* § 102(1). Non-uniformed officers, including federal officers, must "wear at least one visibly identifying agency-issued or department-issued logo, patch, emblem, insignia, or other external identifier clearly identifying such officer as a law enforcement officer within such agency or department acting under color of law." *Id.* § 102(2). These requirements do not apply to "active undercover operations, covert surveillance," or "other investigative activities where identification would compromise such investigation." *Id.* § 102(3)(a).

Motion for Preliminary Injunction                - 7 -

The Termination Act prevents the Federal Government from entering, modifying, renewing, remaining in, or extending "any agreement pursuant to section 287(g) of the Immigration and Nationality Act" with any "local government, law enforcement agency, correctional facility, local correctional facility, juvenile detention facility, or facility for youth placed with or committed to the office of children and family services, or agent thereof." N.Y. Exec. Law § 170-k(2)(a). Come August 25, 2026, any 287(g) agreements that remain in New York "shall be deemed not consistent with state law and any such agreement . . . shall be void and unenforceable," and any state or local partner subject to the law is required to "exercise any applicable termination provision contained in such agreement." *Id.* § 170-k(7)(a). After August 25, 2026, should any local partner wish to enter a 287(g) with ICE, the Termination Act forbids it. Furthermore, the Termination Act not only targets "section 287(g) of the Immigration and Nationality Act codified at 8 U.S.C. § 1357(g)," but also "any formal or informal agreement under which an officer or employee may engage in or assist immigration enforcement, or otherwise may perform a function of an immigration officer." *Id.* 170-k(2)(a)(i).

## LEGAL STANDARD

A preliminary injunction may be granted if the plaintiff establishes (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Where, as here, the government is a party to the suit, the harm to the government and public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A prohibitory preliminary injunction is designed to maintain the status quo ante until a final

Motion for Preliminary Injunction               - 8 -

decision on the merits of the litigation can be entered. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). The status quo ante is "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014).

ARGUMENT

## I.     The United States Has Pre-Enforcement Standing

Article III standing requires a plaintiff to demonstrate a concrete injury that is fairly traceable to the conduct of the defendant and judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To satisfy this requirement based on the threatened enforcement of a law, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Rather, that requirement is satisfied where the plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Once a plaintiff shows that a law facially covers its conduct, enforcement is presumed and the burden shifts to the defendant to affirmatively disavow it. *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 138 (2d Cir. 2023). The "credible-threat standard sets a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review, as courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Id.* (quotations/citations omitted). Further, "the [traceability] requirement is met" where "a plaintiff is threatened by the enforcement of a statute that specifically targets the plaintiff." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992)).

Motion for Preliminary Injunction                    - 9 -

Here, the United States satisfies these requirements. The United States asserts "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a [state] statute[.]" *Driehaus*, 573 U.S. at 159 (citation omitted). The United States has sovereign authority to manage federal law enforcement activities and, under the Supremacy Clause, need not cede that authority by complying with New York's requirements for federal law enforcement officers or attempted termination of Section 287(g) agreements. New York's attempt to regulate the conduct of the Federal Government inflicts a "sovereign injury" on the United States. *United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) ("irreparable harm necessarily results from allowing California to enforce a law invalid under the doctrine of intergovernmental immunity."); *cf. Arizona v. Yellen*, 34 F.4th 841, 851-53 (9th Cir. 2022); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000).

Federal law enforcement agencies will not comply with the Face Covering and Identification Acts. *See* Allen Decl. ¶ 21, Davis Decl. ¶ 20, Flanagan Decl. ¶ 18. Consequently, Defendants threaten federal officers with criminal prosecution. That poses a serious and concrete injury that the Federal Government is entitled to address through this pre-enforcement challenge.

The threat of future enforcement is substantial. The Budget Act was signed into law on May 27, 2026. Enforcement of the Face Covering and Identification Acts begins on June 26, 2026, and the Termination Act, in relevant part, goes into effect on August 25, 2026. The Governor of New York has declared that in her view ICE has perpetrated "flagrant abuses of power" and that those alleged abuses "will not stand in New York." Compl. ¶ 2 n. 1. The Governor even appears to go so far as to refer to ICE officers as "criminals." *Id.* Extreme rhetoric like Governor Hochul's leaves no doubt about whether the challenged New York acts will be enforced. Such enforcement would subject federal officers to potential jail time—that's the whole point of the Challenged Acts.

Motion for Preliminary Injunction                - 10 -

In short, the Challenged Acts impose concrete and immediate harms on the Federal Government and its interests, by threatening federal agents with prosecution, chilling their protected conduct, endangering their safety and the integrity of federal law enforcement operations, and destroying cooperation among Federal Government and state and local entities. *See, e.g.*, Allen Decl. ¶ 21, Davis Decl. ¶ 21, Hargis Decl ¶¶ 13-18, Flanagan Decl. ¶ 18. The United States thus has standing to challenge these laws and need not wait for the potentially dangerous situation that would occur when the State of New York attempts to arrest a federal officer performing official duties.

## II. The United States is Likely to Succeed on the Merits of its Claims Against the Face Covering, Identification, and Termination Acts

The Face Covering and Identification Acts are invalid as they pertain to federal officers because they purport to regulate the Federal Government directly by defining "federal law enforcement officer" to specifically include FBI, DEA, ICE, and CBP officers and agents, and by applying its provisions relating to facial coverings and identification to them. N.Y. Civ. R. Law § 100(2)(c) (citing N.Y. Crim. P. Law § 2.15). All such regulation of federal officers violates the Supremacy Clause. The Termination Act likewise violates principles of intergovernmental immunity by regulating and discriminating against the Federal Government.

The Termination Act is invalid for the independent reasons that it impairs the Federal Government's contracts, violates the Contract Clause, U.S. Const. art. I, § 10, cl. 1, and creates an obstacle to the implementation of Federal law, in violation of the Supremacy Clause, *id.* art. VI, cl. 2. The United States therefore is likely to succeed on the merits

### A. New York's Face Covering and Identification Acts Violate Principles of Intergovernmental Immunity

States have no power to "in any manner control[] the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see Mayo v. United*

*States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state"). The intergovernmental immunity doctrine encapsulates this principle.

A state law violates intergovernmental immunity if it "regulates the United States directly," *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.), "unless Congress provides 'clear and unambiguous' authorization for such regulation," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 175 (1988) (citation omitted); *United States v. Town of Windsor,* 765 F.2d 16, 18 (2d Cir. 1985) ("Absent congressional consent, direct state regulation of the activities of the Government is barred by the Supremacy Clause."). "[I]ntergovernmental immunity … forbids States from regulating the federal government *qua* government and from controlling federal governmental functions in any manner and to any degree." *United States v. California*, 173 F.4th at 1068. An Act that "applies exclusively to law enforcement agencies and their officers, including federal law enforcement agencies and federal law enforcement officers…. directly regulates conduct reserved to sovereigns" and is impermissible under the Supremacy Clause. *Id.*; *see CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025). That is because "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445. The rule is absolute. "No other adjustment of competing enactments or legal principles is possible." *Id.* "[S]tates may not directly regulate the Federal Government's operations." *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996). "The United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931). "If when … acting … within the scope of their authority, [federal] officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State . . . the operations of the general government may at any time be arrested at the will of one of its members." *Davis*, 100 U.S. at 262-63.

For example, states cannot require a federal Post Office employee to obtain a driver's license from the state, because the state may not "require[] qualifications in addition to those that the [federal] Government has pronounced sufficient." *Johnson v. Maryland*, 254 U.S. 51, 57 (1920). Nor can states forbid federal facilities from operating without a state pollution permit. *Hancock v. Train*, 426 U.S. 167, 179-80 (1976). Neither can localities prohibit federal military recruiters from recruiting minors. *United States v. City of Arcata*, 629 F.3d 986, 991-92 (9th Cir. 2010). And states cannot "prevent the federal government from choosing how and through whom it will carry out a core federal function" relating to immigration detention. *CoreCivic, Inc.*, 145 F.4th at 325. Nonetheless, New York purports to regulate federal agents where Congress has provided no authorization for New York's actions.

### 1. New York's Face Covering and Identification Acts Regulate the Federal Government

The Face Covering Act restricts any law enforcement officer, including federal agents, from "wear[ing] any face covering that conceals, disguises, or obscures their facial identity while interacting with the public in the performance of their duties." N.Y. Civ. R. Law § 101(1) (2026). Under the new law, "face covering" generally includes "any opaque mask, garment, helmet, headgear, balaclava, ski mask, neck gaiter, or tactical mask." *Id.* § 100(1). Similarly, the Identification Act requires law enforcement including federal agents to display identification markers according to specific requirements, regardless of whether the officer is uniformed or non-uniformed, when the officer interacts with members of the public. *Id.* § 102(1)-(2). While the law provides for certain exceptions to the Identification Act, it fails to define the terms used in the exceptions, and does not establish who determines when the exceptions apply, leaving federal law enforcement vulnerable to criminal charges. Allen Decl. ¶¶ 19, Davis Decl. ¶¶ 17-20, Hargis Decl. ¶¶ 15-18, Flanagan Decl. ¶¶ 47, 50. For both the Face Covering Act and the Identification Act,

Motion for Preliminary Injunction                    - 13 -

first-time offenders are subject to a violation punishable by up to 15 days in jail, and each subsequent offense is a misdemeanor punishable by up to one year in jail. N.Y. Civ. R. Law §§ 101(2), 102(5); N.Y. Penal Law § 70.15.

Like a similar California law that sought to require federal law enforcement officers to "visibly display identification" when "performing their enforcement duties," the Face Covering and Identification Acts "seek[] to control [federal officers'] conduct in performing law enforcement operations." *California*, 173 F.4th at 1067. The challenged identification requirement "purports to override the federal government's power to determine whether, how, and when to publicly identify its officers," "[a]nd in so doing, it aims to regulate the manner and conditions under which federal agents can enforce federal law." *Id.* That reasoning applies directly to the New York identification requirement in the Identification Act and to the Face Covering Act. Each act seeks to regulate the manner and conditions under which federal officers must operate when conducting their official duties and enforcing the law. *See id.* States have no such power.

## 2.    The Termination Act Regulates the Federal Government

"[T]he activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445, and any state law violates intergovernmental immunity if it "regulates the United States directly," *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.), "unless Congress provides 'clear and unambiguous' authorization for such regulation," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 175 (1988) (citation omitted); *United States v. Town of Windsor*, 765 F.2d 16, 18 (2d Cir. 1985) ("Absent congressional consent, direct state regulation of the activities of the Government is barred by the Supremacy Clause.").

Here, the Termination Act directly regulates the Federal Government by controlling the potential entities the Federal Government may form voluntary agreements with to perform the core government function of enforcing civil immigration law, including 287(g) agreements. This is a

textbook example of an unlawful attempt to regulate the Federal Government. *CoreCivic, Inc.*, 145 F.4th at 321 & 325 (3rd Cir. 2025) (state "law with the 'intent' to forbid new contracts for civil immigration detention" was considered unlawful regulation of the Federal Government because it "interfere[d] with the federal government's core power to enforce immigration laws."); *see also Geo Group, Inc. v. Newsom*, 50 F.4th 745, 757 (9th Cir. 2022) (state law that "would give California the power to control ICE's immigration detention operations in the state by preventing ICE from hiring the personnel of its choice" deemed impermissible regulation of the Federal Government).

While federal law authorizes the formation of agreements with state and local entities to assist in the enforcement of federal immigration law, the State of New York seeks to narrow the entities available to assist the Federal Government with the enforcement of federal immigration law. This is unconstitutional. *CoreCivic*, 145 F.4th at 328 (quoting *McCulloch*, 17 U.S. at 362) ("Unlike a broad-based tax or workplace-safety rule, this law altogether bans a type of contract, and it does so in a market that exclusively serves a federal power. The Founding generation 'surely ... did not intend' for federal operations and the exercise of federal powers to 'depend upon the discretion of the state governments.'").

New York may argue that the United States must show that enforcement of the Act would hinder Federal Government operations. Not so. Even though New York's statute hinders core Federal Government operations, that is just one way to show a state impermissibly regulates the Federal Government. *See CoreCivic, Inc.*, 145 F.4th at 327 (holding that a state law "directly regulates the federal government by substantially interfering with a core federal function"); *United States v. California,* 921 F.3d 865, 880 (9th Cir. 2019) (intergovernmental immunity is implicated when a state "burden[s] [the Federal Government] in some way"); *Pub. Utils. Comm'n of State of Cal. v. United States*, 355 U.S. 534, 543 (1958) (a state law barring federal officials from hiring

Motion for Preliminary Injunction               - 15 -

shipping contractors without state approval violated intergovernmental immunity where the law would have delayed shipments, hampering military missions). When the statute purports to regulate the Federal Government on its face, the Federal Government does not have to show that enforcement of the act would hinder core Federal Government operations. "[I]f a state law directly regulates the conduct of the United States, it is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations." *California*, 173 F.4th at 1066.

### 3. The Termination Act Discriminates Against the Federal Government

Discrimination occurs when a state "treats someone else better than" the federal government, "singl[es] out the Federal Government for unfavorable treatment," *United States v. Washington*, 596 U.S. 832, 839 (2022), or imposes a discriminatory burden on the Federal Government, *see Dawson v. Steager*, 586 U.S. 171, 175 (2019). Here, the Termination Act discriminates against the Federal Government by solely preventing the Federal Government and local agencies from creating 287(g) Agreements for civil immigration enforcement, which is a core federal governmental function. Meanwhile, state and local governments offices and municipalities are not barred from forming agreements to facilitate the detention of individuals for non-immigration purposes and with other entities. Compl. ¶ 111.; *see Washington*, 596 U.S. at 841. Preventing this sort of "discrimination against the Federal Government lies at the heart of the Constitution's intergovernmental immunity doctrine." *Id.*

Even if discrimination against the Federal Government were slight—here, it's not, the Termination Act presents severe harms to the United States—"[t]he intergovernmental immunity doctrine prohibits imposing such a regulatory burden, albeit minimal and incidental to operations, in a discriminatory manner against the federal government." *United States v. California*, 819

Motion for Preliminary Injunction                - 16 -

F.Supp.3d 1109, 1131 (C.D. Cal. Feb. 9, 2026). Indeed, "*any* discriminatory burden on the federal government is impermissible." *United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019) (emphasis in original). Here, the discrimination is explicitly directed against the Federal Government because the Termination Act names the specific Federal law it has singled out for unfavorable treatment, "section 287(g) of the Immigration and Nationality Act codified at 8 U.S.C. § 1357(g)." N.Y. Exec. Law. § 170-k(2)(a)(i) (McKinney).

### B. The Termination Act Unlawfully Impairs the Federal Government's Contracts

The United States is likely to succeed on the merits of its Contract Clause claim because the Termination Act terminates all 287(g) agreements in the state of New York and lacks a significant or legitimate purpose. The Contract Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. State legislation like the Termination Act violates the Contract Clause if it substantially impairs a contractual relationship and is not an appropriate or reasonable way to advance a significant and legitimate public purpose. *See Sveen v. Melin*, 584 U.S. 811, 819 (2018). The more a law impairs a contract, the more scrutiny is applied. *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983).

INA 287(g) agreements are protected from impairment by the Contract Clause. *See Sveen*, 584 U.S. at 818 (the Contract Clause "applies to any kind of contract"). Yet, the Termination Act substantially impairs existing 287(g) agreements between entities in New York and the Federal Government by voiding those agreements statewide. N.Y. Exec. Law § 170-k(7)(a). If any entity wishes to keep its 287(g) agreement with the Federal Government, the Termination Act still orders local participants to terminate the agreement. *Id.* This is a clear example of substantial impairment. *See, e.g.*, *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 630 (5th Cir. 2010).

The Termination Act ends all fourteen currently existing 287(g) agreements between the Federal Government and local law enforcement agencies in New York and eliminates the future use of 287(g) agreements across the entire state, with only limited—mostly irrelevant—exceptions. The Termination Act's invalidation of all 287(g) agreements with entities in New York is also unsupported by any significant or legitimate public purpose. 287(g) agreements are expressly authorized by federal law, 8 U.S.C. § 1357(g), and are voluntary. Should a locality be dissatisfied with a 287(g) agreement, it could terminate the agreement (in writing and with notice) or refuse to enter into the agreement in the first place. An outright ban on 287(g) agreements serves no significant or legitimate public purpose for the State of New York. Prohibiting public entities from continuing to perform under longstanding voluntary agreements specifically authorized by federal law harms the public interest and people of New York. *See* 8 U.S.C. § 1357(g); *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 29–32 (1977).

Nor can New York cite funding as its purported legitimate public purpose. While New York provides some police funding to some counties, towns, and cities, most funding comes from local taxes. Compl. ¶ 120. Again, should a local entity have concerns regarding resources or funding, that entity need not enter into a 287(g) agreement.

The only purpose behind the Termination Act appears to be disagreement with the Federal Government's immigration policies. Indeed, Governor Hochul characterized ICE as "cruel and dangerous."[2] While Hochul's statements are false, they are also telling. Immigration is a purely federal function. Because the Termination Act impedes federal immigration enforcement, which is not subject to state legislation, a state must have an extremely significant public purpose to impair

---

[2] *Governor Hochul Highlights New Laws to Protect New Yorkers and Stand Against ICE Overreach* (May 28, 2026) https://www.governor.ny.gov/news/governor-hochul-signs-comprehensive-immigration-plan-protect-new-yorkers-against-ice.

Motion for Preliminary Injunction                    - 18 -

287(g) agreements and pass constitutional muster. *See Energy Rsrvs.*, 459 U.S. at 411. New York's political disagreements are not a basis to void preexisting contracts or to obstruct a congressional scheme. And even though local agencies are parties to the agreements, the Court may not simply defer to the legislature's purported public purpose. *See U.S. Tr. Co.*, 431 U.S. at 26. Given that the Termination Act lacks a valid public purpose, New York cannot justify the wholesale invalidation of longstanding agreements expressly contemplated by Congress.

Finally, even assuming that the Termination Act had a legitimate and significant purpose sufficient to warrant the termination of all 287(g) agreements in New York—it doesn't—the Termination Act must be tailored to meet that purpose based on reasonable, limited conditions. *See Energy Rsrvs.*, 459 U.S. at 412 ("the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'") (quoting *U.S. Tr. Co.*, 431 U.S. at 22). The Termination Act's invalidation of all existing and future agreements is far from reasonable and appropriate to address any purported public purpose justifying its enactment. *Cf. U.S. Tr. Co.*, 431 U.S. at 29–30 ("it cannot be said that total repeal . . . was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the . . . limitations . . ."). There is no justification for such an extreme measure. The Termination Act therefore violates the Contract Clause and is invalid.

### C. The Termination Act Unlawfully Creates an Obstacle to the Enforcement of Federal Law and the Cooperative Scheme Congress Enacted

When a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," it is preempted. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Congress, through the INA, defined how state and local agencies may interact and participate with Federal immigration enforcement efforts, *supra* § I.B, and "states may not enter,

Motion for Preliminary Injunction                - 19 -

in any respect, an area the Federal Government has reserved for itself." *Arizona v. United States*, 567 U.S. 387, 402 (2012). Immigration is a purely Federal function and "the Supremacy Clause ... bars states from taking actions that frustrate federal laws and regulatory schemes." *City of New York v. United States*, 179 F.3d 29, 354 (2d Cir. 1999). Yet, New York passed the Termination Act, which in purpose and effect bans all fourteen existing 287(g) agreements for immigration enforcement in New York. That means seven TFM agreements, six WSO agreements, and one JEM agreement will be terminated on August 25, 2026.

As designed by Congress, local law enforcement agencies voluntarily entered into memoranda of agreement with ICE. By terminating active and ongoing 287(g) agreements, New York is actively thwarting cooperation between federal and local agencies to remove illegal immigrants from the country, which exposes American citizens in the state of New York to greater risk of being victims of crime. Flanagan Decl. ¶¶ 29, 32-34; *see United States v. Raines*, 362 U.S. 17, 27 (1960); *City of New York*, 179 F.3d at 354 ("A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system."). New York's attempts to the contrary notwithstanding, "states do not retain ... an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs." *Id.*

## III.    The United States Faces Irreparable Harm Absent Preliminary Relief

The United States will be irreparably harmed by each of the Challenged Acts. Irreparable harm necessarily results from the enforcement of a state law that violates the Supremacy Clause. *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 366-67 (1989) (noting that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of ... the express constitutional prescription of the Supremacy Clause" (citation omitted)); *California*, 173 F.4th at 1069 (finding irreparable harm

Motion for Preliminary Injunction                    - 20 -

based on a Supremacy Clause violation). The automatic nature of the irreparable injury stems both from the constitutional violation and the sovereign injuries that result. *Id*. Thus, the United States is irreparably harmed.

### A. The Face Covering and Identification Acts Irreparably Harm the United States

The Face Covering and Identification Acts irreparably harm the United States in several ways, including endangering federal officers and agents, impeding their functions, and chilling federal activities. By design, the Face Covering and Identification Acts endanger federal officers and agents by seeking to publicly expose their personal identities at a time of already escalating violence against federal officers. *See, e.g.*, Hargis Decl. ¶¶ 9-12, Flanagan Decl. ¶¶ 39-49. The exposure would facilitate escalating harassment against those officers by agitators seeking to disrupt their operations. *See, e.g.*, Allen Decl. ¶¶ 16-17, 19; Davis Decl. ¶¶ 15-16; Hargis Decl. ¶¶ 9-12; Flanagan Decl. ¶¶ 39-45. ICE officers and agents are facing an astounding increase in death threats and assaults, which are facilitated by doxxing websites that broadcast the identities and home addresses of officers and their families, encouraging retaliation against them. *See, e.g.*, Flanagan Decl. ¶¶ 39-49. Further, the challenged provisions would enable suspects to identify officers who may be involved in future enforcement actions, including undercover operations. *See* Allen Decl. ¶¶ 8, 15-18; Davis Decl. ¶ 18, Hargis Decl. ¶¶ 17, Flanagan Decl. ¶¶ 46-49. Because suspects who recognize officers may try to evade apprehension and obstruct enforcement efforts, facial covering is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent. *See e.g.*, *id.*

The Identification Act impedes federal functions because it fails to sufficiently account for instances in which agents may interact with the public when performing their official duties, but disclosure of their identity could place them or others at risk, including, for example, surveillance

Motion for Preliminary Injunction                - 21 -

assignments, which will jeopardize such operations. *See* Allen Decl. ¶¶ 15-20, Davis Decl. ¶¶ 15-18; Hargis Decl. ¶¶ 8-18; Flanagan Decl. ¶ 53. Federal agents face a risk of state prosecution for doing their jobs in an inconspicuous manner which may be reasonable—and even necessary—to protect the Federal Government's law enforcement, national security, officer safety, or other operational interests.

And, while there are limited exceptions to the Face Covering and Identification Acts, they are vague and it is unclear who determines whether they are met. Both Acts and the dangers they pose will hinder federal agents and officers from effectively and safely engaging in important federal enforcement operations. *See* Allen Decl. ¶ 19; Davis Decl. ¶¶ 14-19; Hargis Decl. ¶ 13-18; Flanagan Decl. ¶¶ 17, 47, 49-55. Moreover, because the Face Covering and Identification Acts carry criminal penalties, that threat of a state investigation and prosecution can chill officers from engaging in lawful conduct in the performance of their federal duties. Compl. ¶¶ 97-98; *see New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004) (stating that the federal immunity defense provides "immunity from suit rather than a mere shield against liability," to "protect[] federal operations from the chilling effect of state prosecution").

### B.  The Termination Act Irreparably Harms the United States

The Termination Act also impedes federal operations by terminating 287(g) agreements relied upon for federal immigration enforcement. These agreements are vital to ICE's mission and ensure preservation of ICE resources, and the safe and timely transfer and prompt removal of dangerous individuals upon release from state custody. *See* Flanagan Decl. ¶¶ 20, 34. If the Termination Act were to go into effect, six TFM agreements would be invalidated. ICE would therefore lose its cooperation with several counties in New York whose officers are trained by ICE and at ICE expense to exercise immigration authority on ICE-led task forces. *Id.* ¶ 24. This would create a strain on ICE resources and limit its ability to operate effectively. *Id.* ¶ 34. Moreover, the

Motion for Preliminary Injunction                - 22 -

new law would invalidate six WSO agreements and one JEM agreement, which "are instrumental in identifying removable criminal aliens who are already in the custody of local law enforcement, as opposed to forcing ICE officers to execute arrests in public settings." *Id.* ¶ 27. Stripping ICE of this cooperation would lead to more at-large arrests and increased use of ICE resources to safely apprehend criminal aliens. *Id.* ¶ 28.

For these reasons, the challenged provisions threaten to "destroy the federal function" of law enforcement in the State of New York. *United States v. Fresno Cnty.*, 429 U.S. 452, 463 n.11, 464 (1977). Because the Framers of our Constitution "did not intend" for federal operations to "depend on the discretion of the state governments," *McCulloch*, 17 U.S. (4 Wheat.) at 327, 362, New York cannot unilaterally impose its policy preferences on the Federal Government. A "concurrent power in the [S]tates" to regulate federal operations "would bring back all the evils and embarrassments, which the uniform rule of the [C]onstitution was designed to remedy." 2 J. Story, Commentaries on the Constitution § 1099 (3d ed. 1858).

If the Challenged Acts were allowed to stand, there would be nothing to stop other states from imposing further unconstitutional restraints on the Federal Government. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (allowing a state to act unconstitutionally "would allow other States to do the same"). This could create a "patchwork" system of laws, *id*., under which federal agents would be subject to different regulations in each state, severely undermining the Federal Government's ability to uniformly enforce federal law. New York is not the only state to have passed such laws. *See, e.g.*, *California*, 921 F.3d at 880 (partially enjoining California law imposing facial covering ban and identification requirement for federal officers); Complaint, *United States v. Virginia*, No. 3:26-cv-545 (E.D.V.A. June 11, 2026), ECF No. 1; Complaint,

Motion for Preliminary Injunction                - 23 -

*United States v. Connecticut*, No. 3:26-cv-758 (D.Conn. May 15, 2026) ECF No. 1. The United States thus faces irreparable harm from the challenged New York laws.

### IV.    The Balance of Hardships and the Public Interest Favor the United States

The merged factors of the balance of equities and the public interest likewise favor the United States. First a violation of the Supremacy Clause necessarily means that "both the public interest and balance of the equities tip 'decisively in ... favor' of a preliminary injunction." *California*, 173 F.4th at 1069. There is no public interest in enforcing an unconstitutional law or violating the Supremacy Clause. *Id*. "[A]ll citizens have a stake in upholding the Constitution, meaning it is always in the public interest to prevent the violation of a party's constitutional rights." *Id*. at 1060; *see also A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021) ("the public interest is well served by the correction of this constitutional harm"). There is, however, significant public interest in protecting federal officers' safety, removing unlawful impediments to federal law enforcement operations, and avoiding potential conflict between state and federal agents. Indeed, "[f]rustration of federal statutes and prerogatives are not in the public interest." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see Am. Fin. Servs. Assn. v. Burke*, 169 F. Supp. 2d 62, 71 (D. Conn. 2001); *see Glidedowan, LLC v. New York State Dep't of Health*, 768 F. Supp. 3d 503, 525 (W.D.N.Y. 2025) (noting "public interest considerations associated with the performance of government functions possess a high value when balancing the equities.").

It is well within the public interest to protect federal officers' safety and remove unlawful impediments to federal law enforcement as posed by the Face Covering and Identification Acts' ban on facial coverings and affiliation and identification display requirements. Likewise, it is not in the public interest to subject federal agents to increased harassment, doxxing, and violence. *See* Hargus Decl. ¶¶ 6-9. When federal agents' identities are revealed, the resulting harm is not always limited to their official duties; it can impact their families as well. *Id.* New York is undermining

Motion for Preliminary Injunction                - 24 -

the public interest by setting federal officers and state officers on a collision course, as the federal government will not comply. Compl. ¶ 89. New York attempts to chill effective enforcement of federal law—that is not in the public interest. *Id.* ¶ 97.

The Termination Act's invalidation of all 287(g) agreements, present and future, in New York is also not in the public interest. Congress expressly provided for cooperation between the Federal Government and local governmental entities for the purpose of "investigation, apprehension, or detention of aliens in the United States[.]" 8 U.S.C. § 1357(g)(1). Such cooperation makes law enforcement more effective and safer for the public. Yet, the Termination Act seeks to categorically bar this cooperation despite the tremendous burdens that would be imposed on the Federal Government. Flanagan Decl. ¶¶ 19-35. The Termination Act is also contrary to the public interest because it would impair ICE's ability to effectively identify, detain, and remove individuals who are a threat to public safety. *Id.* ¶¶ 33-34. Accordingly, an injunction would serve the public interest. *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010). Therefore, the balance of equities and the public interest support a preliminary injunction. *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court preliminarily enjoin Defendants, their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of the Defendants, from enforcing N.Y. Civil Rights Law §§ 100–02 and N.Y. Exec. Law § 170-k against the Federal Government.

DATED:     June 23, 2026

Respectfully Submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

Motion for Preliminary Injunction          - 25 -

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

By:

s/  Brandon D. Neuman
BRANDON D. NEUMAN (CA Bar No. 319067)
LUKE A. MILLER (MN Bar No. 0504247)
Trial Attorneys
U.S. Department of Justice Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
(202) 227-7416
Brandon.Neuman@usdoj.gov
Luke.Miller@usdoj.gov

*Attorneys for Plaintiff United States of America*