UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

          Plaintiff,

          v.

STATE OF NEW YORK; KATHY HOCHUL,
Governor of New York, in her official capacity;
LETITIA JAMES, Attorney General of New York,
in her official capacity,

          Defendants.

No. 26-cv-1360 (MAD) (ML)

<br>

# MEMORANDUM OF LAW IN OPPOSITION TO
# PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

<br>

LETITIA JAMES
*New York State Attorney General*
28 Liberty Street
New York, New York 10005

LINDA FANG
  *Special Litigation Counsel*
    *of Counsel*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF THE CASE....................................................................................................3

    I.        STATUTORY AND REGULATORY FRAMEWORK ............................................3

        A.    The Face Coverings and Identification Provisions ......................................................3

        B.    The 287(g) Provisions .................................................................................................5

    II.       PROCEDURAL HISTORY ....................................................................................6

STANDARD OF REVIEW .........................................................................................................7

ARGUMENT...............................................................................................................................7

    I.        PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS...........................7

        A.    The Challenged Provisions Do Not Violate Intergovernmental Immunity................7

            1.    The Face Coverings and Identification Provisions Do Not Violate the Intergovernmental Immunity Doctrine .........................................................9

            2.    This Court need not follow the Ninth Circuit's minimally reasoned interlocutory order .....................................................................................15

            3.    The 287(g) Provisions Do Not Violate Intergovernmental Immunity............16

        B.    Plaintiff's Remaining Challenges to the 287(g) Provisions Are Also Meritless ...................................................................................................................19

            1.    Federal Law Does Not Preempt the 287(g) Provisions .................................19

            2.    The 287(g) Provisions Do Not Violate the Contracts Clause........................20

II.  PLAINTIFF HAS FAILED TO DEMONSTRATE THAT IT WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION...............................22

III. THE PUBLIC INTEREST VASTLY OUTWEIGHS ANY HARMS TO PLAINTIFF .........24

CONCLUSION.........................................................................................................................25

i

**TABLE OF AUTHORITIES**

**Cases**                                                                                              **Page(s)**

*American Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120 (D. Mass. 2025) ..... 13, 14, 24

*Arizona v. United States*, 567 U.S. 387 (2012) ................................................................... 7

*Bond v. United States*, 572 U.S. 844 (2014) ..................................................................... 14

*Buchanan v. Warley*, 245 U.S. 60 (1917) ......................................................................... 14

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362 (2d Cir. 2006) ....................................... 21

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) ............................................. 25

*City of Detroit v. Murray Corp. of Am.,* 355 U.S. 489 (1958) ......................................... 15

*City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018) ........................................... 18, 19

*City of New York v. State*, 86 N.Y.2d 286 (1995) ............................................................ 20

*Commonwealth v. Closson*, 229 Mass. 329 (1918) ........................................................... 9

*Connecticut State Police Union v. Rovella*, 36 F.4th 54 (2d Cir. 2022) ......................... 21

*CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325 (3d Cir. 2025) ....................... 10

*County of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020),
    aff'd sub nom Ocean County Bd. of Commrs. v. Attorney General,
    8 F.4th 176, 181-82 (3d Cir. 2021) ........................................................................... 19

*Dawson v. Steager*, 586 U.S. 171 (2019) ........................................................................ 17

*Don't Tear It Down, Inc. v. Pennsylvania Ave. Dev. Corp.*, 642 F.2d 527 (D.C. Cir. 1980) ......... 8

*Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1 (D.D.C. 2025) .................. 24

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) .............................. 22

*Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) ............................................... 10

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ........................................................................ 7

*Hancock v. Train*, 426 U.S. 167 (1976) ......................................................................... 8, 9

**TABLE OF AUTHORITIES (con't)**

**Cases**                                                                        **Page(s)**

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ... 19

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) ... 21

*Johnson v. Maryland*, 254 U.S. 51 (1920) ... 8, 9, 15

*JTH Tax, LLC v. Agnant*, 62 F.4th 658 (2d Cir. 2023) ... 22

*Kentucky v. Long*, 837 F.2d 727 (6th Cir. 1988) ... 15

*Marsh v. Rosenbloom*, 499 F.3d 165 (2d Cir. 2007) ... 19

*Maryland v. King*, 133 S. Ct. 1 (2012) ... 24

*McCulloch v. Maryland*, 17 U.S. 316 (1819) ... 8

*McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022) ... 17, 18, 20, 23

*National Shooting Sports Foundation, Inc. v. James*, 144 F.4th 90 (2d Cir. 2025) ... 12

*New York v. Tanella*, 374 F.3d 141 (2d Cir. 2004) ... 11

*Nken v. Holder*, 556 U.S. 418 (2009) ... 7

*North Dakota v. United States*, 495 U.S. 423 (1990) ... 7, 8

*Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025) ... 11

*Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999) ... 22

*State v. Ivory*, 906 F.2d 999 (4th Cir. 1990) ... 9

*Sveen v. Melin*, 138 S. Ct. 1815 (2018) ... 21

*Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186 (5th Cir. 2024) ... 8, 9, 10, 15

*United States v. California*, 173 F.4th 1060 (9th Cir. 2026) ... 15

*United States v. California*, 819 F. Supp. 3d 1109 (C.D. Cal. 2026), *reversed on other grounds*, 173 F.4th 1060 (9th Cir. 2026) ... 14

**TABLE OF AUTHORITIES (con't)**

**Cases** **Page(s)**

*United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025).....................................................23

*United States v. New York (Green Light)*, 814 F. Supp. 3d 266 (N.D.N.Y. 2025)................... 8, 17

*United States v. New York (POCA)*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025)........................ passim

*United States v. Salerno*, 481 U.S. 739 (1987) ............................................................... 12

*United States v. Tanella*, 374 F.3d 141 (2d Cir. 2004) ...................................................... 11, 12, 24

*United States v. Washington*, 596 U.S. 832 (2022) ........................................................ 7

*Urquilla-Ramos v. Trump*, 821 F. Supp. 3d 603 (S.D.W.Va. 2026) ....................................... 1, 23

*VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010) ........................................ 12

*Washington v. United States*, 460 U.S. 536 (1983) ........................................................ 17

*Weisshaus v. Cuomo*, 512 F. Supp. 3d 379 (E.D.N.Y. 2021) ....................................................... 24

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................ 7

**Statutes**

10 U.S.C. § 723.............................................................................................................. 9, 10
8 U.S.C. § 1357(g) ........................................................................................................... 5
8 U.S.C. § 1442................................................................................................................ 11
Ch. 55, part LL, 2026 N.Y. Laws ................................................................................. 3
Ch. 55, part LL, subpt. A, 2026 N.Y. Laws.................................................................... 5
Ch. 55, part LL, subpt. F, § 3, 2026 N.Y. Laws ............................................................ 5
Ch. 55, pt. LL, subpt. A, § 4, 2026 N.Y. Laws............................................................... 5
N.Y. Civil Rights Law § 100 ......................................................................................... 3
N.Y. Civil Rights Law § 101 ......................................................................................... 4
N.Y. Civil Rights Law § 102 ......................................................................................... 4
N.Y. Civil Rights Law §§ 100-102................................................................................ 3, 13
N.Y. Exec. Law § 170-k ................................................................................................ 5, 17

**Other Authorities**

Albany Law School, ICE and Local Law Enforcement: 287(g): An Explainer,
https://tinyurl.com/4pyxsukb.................................................................................... 5

**TABLE OF AUTHORITIES (con't)**

**Other Authorities**                                                                              **Page(s)**

Br. of Amici Curiae Federalism Professors, filed in
*United States v. New York (POCA)*, No. 26-104 (2d Cir.) (ECF No. 44.1) ............................... 8

Decl. of Scott Shuchart, dated July 13, 2026, filed in
*United States v. State of Conn.*, No. 26-cv-758 (D. Conn.) (ECF No. 31-6) ............................ 9

Governor's Program Bill No. 18 for A.B. 10005/S.B. 9005 ............................................ 6

**Regulations**

8 C.F.R. § 287.8 ................................................................................................. 9, 10
9 N.Y.C.R.R. § 8.170 (2017) ................................................................................... 6

**PRELIMINARY STATEMENT**

Over the past eighteen months, "agents of the federal government—masked, anonymous, armed with military weapons, operating from unmarked vehicles, acting without warrants of any kind—are seizing persons for civil immigration violations and imprisoning them without any semblance of due process." *Urquilla-Ramos v. Trump*, 821 F. Supp. 3d 603, 611 (S.D.W.Va. 2026). These unprecedented actions have caused significant harms in New York (and across the country) by instilling fear and confusion in citizens and non-citizens alike, impairing public safety, and straining scarce state and local resources. In May 2026, Governor Hochul and the New York Legislature acted by enacting a comprehensive set of laws aimed at countering these harms to the State's sovereign interests. As relevant here, these laws prohibit law enforcement officers operating in the State from concealing their identities through face coverings when interacting with the public and generally require such officers to identify their employing agency, subject to exceptions tailored to protect the officers' health and safety. The State also enacted laws prohibiting local authorities from entering into agreements to assist the federal government with enforcing the civil immigration laws, reflecting the State's longstanding policy that its interests are best served by disentangling itself from federal civil immigration enforcement.

Plaintiff now seeks the extraordinary remedy of preliminarily enjoining these state-law provisions based on sweeping theories of intergovernmental immunity and conflict preemption. These claims ignore New York's sovereign interests and are unsupported by law. The State is not required to sit idly by in the face of unwarranted federal intrusions on its sovereign duty to protect its residents, and may exercise its sovereign power to direct that its resources are focused on local safety, not federal priorities. This Court should deny plaintiff's preliminary injunction motion.

Plaintiff has no likelihood of success on the merits. First, the State's requirements that law

enforcement officers do not conceal their identities or their agency affiliations while performing their official duties do not impermissibly regulate the federal government in violation of intergovernmental immunity. These state-law requirements do not prohibit federal officials from carrying out their duties in arresting or detaining individuals, or dictate who they arrest or how those arrests occur. Where, as here, there is no federal law or policy requiring the use of face coverings or requiring federal agents to conceal their agency affiliations when performing their public-facing duties, the challenged laws are permissible rules that merely govern the "mode" of how federal officials carry out their duties and do not run afoul of intergovernmental immunity.

Second, the prohibition against local entities assisting with federal immigration efforts likewise does not violate intergovernmental immunity because the prohibition is directed to the actions of local entities and does not directly regulate the federal government. Nor does it treat any other similarly-situated actor more favorably than the federal government. The prohibition also does not violate the Contracts Clause because any impairment to preexisting assistance agreements is justified by the State's important interests underlying the prohibition. And the prohibition is not preempted by federal law where federal law expressly permits States the option to enter into such agreements in the first place, and makes clear any assistance must be consistent with state law.

In any event, plaintiff is not entitled to the extraordinary remedy of a preliminary injunction where the harms it asserts are not irreparable. Plaintiff's own statements that it has no intention of complying with the challenged state laws undermine its claims that federal agents are chilled in carrying out their federal duties. Moreover, balanced against plaintiff's tenuous assertions, the demonstrated harms to the State and its residents from allowing federal agents to continue to carry out their operations without regard for state law or the negative impacts to public safety and public trust weighs decidedly against a preliminary injunction.

2

**STATEMENT OF THE CASE**

**I.    STATUTORY AND REGULATORY FRAMEWORK**

In May 2026, the New York Legislature enacted a series of laws as part of Budget Bill S9005-C aimed at protecting New York residents and state resources. *See* Ch. 55, part LL, 2026 N.Y. Laws. Two discrete portions of these laws are at issue in this motion.

**A.    The Face Coverings and Identification Provisions**

First, the Budget Bill amended the State's Civil Rights Laws to set forth clear standards to ensure that law enforcement officers, while interacting with members of the public in the performance of their official duties, are identifiable as law enforcement personnel (the "Face Coverings and Identification Provisions"). *See* Civil Rights Law §§ 100-102. All law enforcement officers operating in the State, including state or local police, peace officers, and federal law enforcement officers, are subject to the Face Coverings and Identification Provisions. *Id.* § 100(2).

The Legislature adopted these provisions in response to the harms caused by a rise in the use of face coverings by law enforcement officials and the failure of such officials to clearly identify themselves when conducting routine enforcement operations in the State. These unprecedented law enforcement practices have caused public fear and confusion, reduced official accountability for their actions, impaired public safety by increasing opportunities for criminals to commit crimes while impersonating law enforcement officials, and strained local law enforcement resources across the country, including in New York.[1]

---

[1] *See, e.g.*, Libor Jany, *Kidnappers or ICE agents? LAPD Grapples With Surge in Calls From Concerned Citizens*, L.A. Times (July 3, 2025), https://tinyurl.com/2x6muwdd (describing spate of 911 calls reporting kidnappings after citizens witnessed masked ICE operations); Sam Levin, *Police Across The US Worry Officers Are Being Misidentified As ICE, Records Show*, The Guardian (Apr. 24, 2026), https://tinyurl.com/4xfhta4j (describing how deployment of masked agents has led to "misidentification" and safety concerns for local police, costing time and

(*continued on the next page*)

3

Accordingly, the Face Coverings and Identification Provisions prohibit any law enforcement officers in the State from wearing a "face covering that conceals, disguises, or obscures their facial identity while interacting with the public in the performance of their duties." Civil Rights Law § 101. A face covering is defined to exclude, among other things, masks necessary to protect the health and safety of the law enforcement official, *id.* § 100(b), (c), (m), or those "worn for the purpose of active undercover operations," *id.* § 100(i).

The Face Coverings and Identification Provisions also generally require uniformed law enforcement officers "while interacting with the public in the performance of their duties" to "visibly display" the name of the officer's employing agency, along with "at least one form of identification of the officer, such as the officer's name, badge number, or shield number." *Id.* § 102(1)(a)-(b). For law enforcement officers "who are not uniformed while interacting with the public in the performance of their duties," they must wear "at least one visibly identifying . . . emblem or insignia or other external identifier clearly identifying" the officer's employing agency. *Id.* § 102(2). The statute sets forth a number of exceptions aimed at protecting the safety of the officers and operational goals, providing that its provisions (including both the face covering prohibitions and the identification requirements) do not apply to "officers engaged in active undercover operations, covert surveillance, or other investigative activities where identification may compromise such investigation," among other things. *Id.* § 102(3)(a).

Violations of the Face Coverings and Identification Provisions are subject to criminal

---

resources); Rebecca Beitsch, *FBI Urges ICE to ID Themselves as Criminals Impersonate Officers*, The Hill (Nov. 5, 2025), https://tinyurl.com/vau7kp65 (discussing how criminal impersonations of ICE agents "make it difficult for the community to distinguish between legitimate officers conducting lawful law enforcement action and imposters engaging in criminal activity"); Hannah Fingerhut et al., *Minnesota Sues Trump Administration over Shootings*, AP News (Mar. 24, 2026), https://tinyurl.com/mr3mkrss (reporting on lawsuit seeking records pertaining to shootings of citizens by masked agents which federal administration had refused to provide).

prosecution as violations (for a first offense) and misdemeanors (for each subsequent offense). *Id.* § 101(2). The Face Coverings and Identification provisions took effect on June 26, 2026. Ch. 55, part LL, subpt. F, § 3, 2026 N.Y. Laws.

### B.   The 287(g) Provisions

Second, the Budget Bill also amended provisions of the Executive Law. *See* Ch. 55, part LL, subpt. A, 2026 N.Y. Laws; Exec. Law § 170-k. As relevant here, the amended Executive Law provisions state that the State and its subdivisions, including local governments, law enforcement agencies or detention facilities may not "enter into, modify, renew, remain in, or extend" any "agreement pursuant to section 287(g) of the Immigration and Nationality Act ["INA"] codified at 8 U.S.C. § 1357(g)" to provide assistance to federal authorities with immigration enforcement (the "287(g) Provisions").[2] Exec. Law § 170-k(2(i). That includes "any formal or informal agreement under which an officer or employee [of a state or local government entity] may engage in or assist immigration enforcement, or otherwise may perform a function of an immigration officer." *Id.* § 170-k(2)(a)(i). The challenged provisions of the Executive Law provide that any preexisting 287(g) agreements will be deemed null and void in their entireties as of August 25, 2026, and directs local entities with any such agreements to terminate them. *Id.* § 170-k(7); Ch. 55, pt. LL, subpt. A, § 4, 2026 N.Y. Laws, p. 48.

---

[2] 8 U.S.C. § 1357(g) authorizes the federal government to enter into agreements with state and local governments permitting state and local officials to assist with the performance of the federal government's immigration enforcement duties. *See generally* Albany Law School, ICE and Local Law Enforcement: 287(g): An Explainer, https://tinyurl.com/4pyxsukb.

Whether to enter into such agreements is a state and local prerogative. 8 U.S.C. § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection"). Any such agreements only authorize conduct by state or local officers "to the extent consistent with State and local law." *Id.* § 1357(g)(1).

The 287(g) Provisions reflect the State's longstanding policy choice to prioritize the use of state and local resources on state and local issues rather than federal civil immigration enforcement. *See, e.g.*, 9 N.Y.C.R.R. § 8.170 (2017) (executive order directing state officials to refrain from participating in federal civil immigration enforcement). Additionally, the 287(g) Provisions sought to address the State's concerns that the "use of local law enforcement officers and assets for the enforcement of federal civil immigration violations . . . draws critical public safety resources away from essential law enforcement functions that keep New York's residents and communities safe." Governor's Program Bill No. 18 for A.B. 10005/S.B. 9005 at 2, *available at* https://tinyurl.com/4z3y7f4c.

## II.    PROCEDURAL HISTORY

On June 23, 2026, plaintiff commenced this action in the U.S. District Court for the Western District of New York seeking to enjoin the Face Coverings and Identification and 287(g) Provisions, based on the intergovernmental immunity doctrine (Counts I to III), the Contracts Clause (Count IV), and conflict preemption (Count V). The complaint names the State of New York, Governor Kathy Hochul and Attorney General Letitia James, in their official capacities, as defendants. The complaint also named Michael Russo, in his official capacity as the Assistant Attorney General in Charge of the Attorney General's Buffalo regional office, as a defendant.

Shortly after commencing this action, plaintiff moved for a preliminary injunction and sought to expedite hearing on that motion. ECF Nos. 4, 5. Defendants moved to dismiss Russo and transfer venue to this Court. ECF No. 6. The district court (Vilardo, J.) dismissed Russo as a defendant on the basis that "the complaint fails to plead any connection between [the Buffalo regional office] and any harm alleged in the lawsuit" and transferred the action to this Court. ECF No. 21 at 2.

6

**STANDARD OF REVIEW**

"A preliminary injunction is an extraordinary remedy never awarded as of right," and requires "a clear showing" of all of the preliminary-injunction factors—namely, a likelihood of success on the merits, irreparable harm in the absence of preliminary relief, a balance of equities in the movant's favor, and proof that an injunction would be in the public interest, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20-24 (2008), with the latter two factors merging where, as here, the injunction would run against the government, *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**ARGUMENT**

**I.    PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS**

**A.    The Challenged Provisions Do Not Violate Intergovernmental Immunity**

Federalism, a central tenet of the Constitution, is grounded in the concept that both federal and state governments "have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398-99 (2012). The Constitution's structure of dual sovereigns, like "the separation and independence of the coordinate branches of the Federal Government," was intended by the Founders as a further check against "the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458-59 (1991).

Under the intergovernmental immunity doctrine—the companion to the Tenth Amendment's anti-commandeering principle—a state law is invalid "if it regulates the United States directly or discriminates against the Federal Government." *North Dakota v. United States*, 495 U.S. 423, 435 (1990); *United States v. Washington*, 596 U.S. 832, 838 (2022) (intergovernmental immunity doctrine prohibits "States from interfering with or controlling the operations of the Federal Government").

7

As the Supreme Court has instructed, in considering claims in the sensitive area of intergovernmental immunity, courts must adopt "a functional approach" that "accommodat[es] the full range of each sovereign's legislative authority." *North Dakota*, 495 U.S. at 435. For example, courts have invalidated state laws that sought to tax the federal government, or entirely bar federal officials from conducting federal operations without a license or approval from the state. *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. 316 (1819) (tax); *Hancock v. Train*, 426 U.S. 167, 179-80 (1976) (state could not require federal agencies to obtain permit from state in order to conduct federal functions); *Don't Tear It Down, Inc. v. Pennsylvania Ave. Dev. Corp.*, 642 F.2d 527, 535 n.71 (D.C. Cir. 1980) (collecting cases); *United States v. New York (POCA)*, 810 F. Supp. 3d 329, 352 (N.D.N.Y. 2025) (same); *see also generally* Br. of Amici Curiae Federalism Professors at 10-17, filed in *United States v. New York (POCA)*, No. 26-104 (2d Cir.) (ECF No. 44.1) (discussing limits of intergovernmental immunity doctrine and relevant cases).

In evaluating claims under the intergovernmental immunity doctrine, numerous courts (including this one) have held that "the key question is whether state law seeks to improperly 'control' the employee's federal duties, or whether the law only 'might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets.'" *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024) (quoting *Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920)); *New York (POCA)*, 810 F. Supp. 3d at 352-53; *United States v. New York (Green Light)*, 814 F. Supp. 3d 266, 281-82 (N.D.N.Y. 2025).

Under these well-settled standards, neither the Face Covering and Identification Provisions nor the 287(g) Provisions violate the intergovernmental immunity doctrine.

8

### 1. The Face Coverings and Identification Provisions Do Not Violate the Intergovernmental Immunity Doctrine

It is well settled that the intergovernmental immunity doctrine does not bar "all state regulation which may touch the activities of the Federal Government." *Hancock*, 462 U.S. at 179. Nor do federal actors have any "general immunity from a state law while acting in the course of [their] employment." *Johnson*, 254 U.S. at 56. Rather, in the absence of any conflicting federal requirement, the application of "general [local] rules that might affect incidentally the mode of carrying out" the federal actor's duties would not violate intergovernmental immunity. *Id.*; *Commonwealth v. Closson*, 229 Mass. 329, 333-34 (1918) (federal mail carrier required to comply with local traffic laws; official duties in transporting mail do not "confer extraordinary rights upon mail carriers to use the [roadways] as they please, or necessarily, or impliedly do away with the power of supervision and control inherent in the state"); *Texas*, 123 F.4th at 206-08 (federal agents subject to state tort laws in carrying out federal duties); *State v. Ivory*, 906 F.2d 999, 1001-02 (4th Cir. 1990) (military driver required to comply with local traffic laws).

The Face Coverings and Identification Provisions readily survive under these standards because they do not dictate, interfere with, or otherwise control who federal agents may arrest or detain or how those arrests or detentions occur. Federal agents remain free to conduct their federal arrest and detention functions within the State subject to the new minimum identification requirements that are consistent with federal law and longstanding federal policy and practice.[3] As

---

[3] *See, e.g.*, Decl. of Scott Shuchart, dated July 13, 2026 at ¶¶ 24-27, filed in *United States v. State of Conn.*, No. 26-cv-758 (D. Conn.) (ECF No. 31-6) (Shuchart Decl.) (former ICE official attesting that use of face coverings was "extremely uncommon" prior to 2025); 8 C.F.R. § 287.8(c)(2)(iii) (requiring federal immigration officials to identify themselves at the time of arrests as soon as it is practicable to do so); 10 U.S.C. § 723 (requiring federal law enforcement personnel to visibly display a name or unique identifier, and the name of employing agency when responding to civil disturbances).

such, the challenged provisions do no more than provide "the mode of carrying out" federal duties and incidentally burden federal conduct. *See, e.g.*, *Texas*, 123 F.4th at 206 (requiring federal agents to comply with state tort laws concerning trespass and destruction of private property when performing their functions did not violate intergovernmental immunity); *cf. Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 752 (9th Cir. 2022) (statewide ban on private detention facilities effectively barred federal authorities from carrying out their detention functions in the state); *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325, 327 (3d Cir. 2025) (same). Any such burden is but a permissible "normal incident in a system with dual sovereigns." *CoreCivic*, 145 F.4th at 319.

Plaintiff's claim that the Face Coverings and Identification Provisions are categorically invalid as applied to the federal government cannot be reconciled with its acknowledgment that no federal law or policy mandates that all federal law enforcement officers wear face coverings or refuse to identify themselves or their employing agency. *See* Compl. ¶¶ 101-102 (providing that officers have "discretion" to do so "depending on the facts and circumstances of each particular case"). Nor have any of plaintiff's declarants attested to the existence of any federal law or policy requiring federal agents to conceal their identities or their agency affiliations while conducting routine operations in interfacing with the public. If anything, federal law is to the contrary: federal regulations governing immigration agents mandate that the agents identify themselves at the time of arrests "as soon as it is practical and safe to do so." 8 C.F.R. § 287.8(c)(2)(iii); *see also* 10 U.S.C. § 723 (requiring federal law enforcement to visibly display officer's name or unique identifier and name of employing agency when responding to civil disturbances). Put differently, there is simply no federal requirement that conflicts with the state laws challenged here.

Plaintiff's assertion that face coverings are "necessary" to the performance of the official duties of federal law enforcement officers (Compl. ¶¶ 95, 99) is also undermined by the fact that

10

some federal officers opt not to wear face coverings during enforcement operations (even where their colleagues may choose differently).[4] As applied to these officers, it cannot be said that the Face Coverings and Identification Provisions impermissibly controls them, when they already opt to perform their federal functions in full compliance with the challenged state laws. It simply cannot be that a state criminal law of general applicability can be categorically invalidated based solely on the subjective preferences of some federal officials who prefer to conceal their identities while discharging their official duties.

Plaintiff's arguments that it may be necessary for federal agents to conceal their identities in conducting certain federal operations also miss the mark in this facial challenge. Whether a federal actor's official conduct, when it violates a state criminal law, was "necessary and proper" in furtherance of the actor's official duties is a fact-specific inquiry that goes to the distinct question of whether that federal actor may successfully assert an immunity *defense* from state prosecution in a particular case.[5] *See United States v. Tanella*, 374 F.3d 141, 148-49 (2d Cir. 2004) (explaining the "defense of Supremacy Clause immunity to state prosecution"). That a federal actor may be immune in a particular state criminal prosecution does not render the state law underlying the prosecution categorically invalid as applied to all federal actors. To provide a concrete example, it may be that a federal agent's operational effectiveness is improved if the agent did not have to comply with speed limits when pursuing a suspect. However, it does not follow from this that

---

[4] *See, e.g.*, *Ozturk v. Hyde*, 136 F.4th 382, 389 (2d Cir. 2025) (noting that within a group of six plainclothes federal officers who arrested a student, only some were masked).

[5] If federal agents are prosecuted criminally for conduct occurring in the performance of their official duties, federal law permits them to remove those prosecutions to federal court. *See* 8 U.S.C. § 1442(a). In federal court, federal officials may assert a Supremacy Clause immunity defense by demonstrating that their conduct, even if contrary to state law, was "necessary and proper in the discharge" of their federal duties so as to warrant dismissal of the prosecution on immunity grounds. *See, e.g.*, *New York v. Tanella*, 374 F.3d 141, 147-48 (2d Cir. 2004).

speed limit laws are categorically invalid as applied to all federal agents. Indeed, as the Second Circuit has cautioned, the application of the Supremacy Clause immunity defense—which is not implicated here—requires courts to "walk the fine line created between the goal of protecting federal officials acting in the scope of their duties and the obligation to avoid granting a license to federal officials to flout state laws with impunity." *Tanella*, 374 F.3d at 146. Such "delicate balancing" must be undertaken based on the particular facts of each case, *see id.*, and in any event is not at issue in this case where plaintiff is seeking categorical invalidation. Indeed, facial challenges necessarily fail when a statute may be validly applied in some scenarios. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 745 (1987) (standards for facial invalidation); *National Shooting Sports Foundation, Inc. v. James*, 144 F.4th 90, 112 (2d Cir. 2025).

For similar reasons, plaintiff is not aided by its complaints (Pl.'s Br. at 22) about the vagueness of the safety-related exceptions to the Face Coverings and Identification Provisions and purported uncertainty about how the statute would apply in hypothetical situations. As this Court has recognized, "[q]uestions about how [a state law] would apply in particular situations, and whether federal officials may be immune from liability in certain cases . . . do not render the statute facially invalid." *New York (POCA)*, 810 F. Supp. 3d at 348 n.7. Rather, such questions are properly considered by courts on an as-applied basis in a proceeding seeking to enforce the challenged state law provisions, based on "actual conduct and not with respect to hypothetical situations at the periphery of the statute's scope." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010).

Finally, plaintiff's disagreement with the policy motivating the Face Coverings and Identifications Provisions is neither factually supported nor relevant to the intergovernmental immunity analysis. These provisions were duly enacted under New York's inherent police powers

in order to protect public safety, and to enhance trust in and accountability of law enforcement. The challenged provisions expressly apply only to law enforcement officers while they are "interacting with members of the public" and include carefully crafted exceptions aimed at protecting operational efficiency and officer safety, including those for undercover or surveillance operations, or where face coverings may be required due to health and safety concerns. *See, e.g.*, Civil Rights Law §§ 100(1)(b)-(c), (i), (m), 102(3)(a)-(b). These exceptions rebut the bulk of the safety and operational concerns posited by plaintiff's declarants.[6]

In addition, ample authorities—as well as common sense—cast doubt on the conclusory claims of plaintiff's declarants who posit that federal officers who wear face coverings or do not identify themselves as law enforcement are safer or more effective at doing their jobs.[7] It is natural that individuals will react with alarm and terror when a masked group physically restrains a person, or forces somone into an unmarked vehicle. There is also reason to question plaintiff's conclusory claims of increased assaults on federal agents as justification for concealing their identities when interacting with the public.[8] Plaintiff's complaints that allowing members of the public to identify

---

[6] *See, e.g.*, Decl. of Matthew Allen (ECF No. 4-3) at ¶¶ 15, 20 (discussing covert surveillance and undercover operations of DEA agents); Decl. of Justin Hargis (ECF No. 4-5) at ¶ 17 (stating CBP uniform modifications "may be operationally necessary when conducting investigative or protective activities"); Decl. of Allen Davis II (ECF No. 4-4) at ¶ 18 (discussing FBI surveillance operations).

[7] *See, e.g.*, *American Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 160-61 (D. Mass. 2025) (finding that student approached by unidentified federal agents on the street "pulled away, and screamed" until agents identified themselves as law enforcement, at which point she complied); Shuchart Decl. at ¶¶ 35, 39, 43; Allie Preston, *Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification*, Ctr. For Am. Progress (Aug. 28, 2025), https://tinyurl.com/56dnrbn9 (noting that friendly fire, bystander intervention, and criminal impersonations are among the safety concerns generated by lack of identification).

[8] *See, e.g.*, Allison Sherry et al., *White House Claims "More than 1000%" Rise in Assaults on ICE Agents, Data Says Otherwise*, Colorado Public Radio (Oct. 10, 2025), https://tinyurl.com/2u8jdywv; Alexandra Berzon et al., *When Trump Officials' Claims About*
(*continued on the next page*)

13

the law enforcement officers they are interacting with and what agency those officers are employed by will increase the risk of the officers being harassed or assaulted—even if these purported risks are credited—are insufficient to warrant the facial invalidation of a state criminal law enacted under the State's core police powers. In any event, some courts have rejected the same purported safety justifications proffered here. *See, e.g.*, *American Ass'n of Univ. Professors*, 802 F. Supp. 3d at 174 (rejecting testimony by federal agents stating safety concerns for masking as "disingenuous, squalid and dishonorable"). And others, while recognizing that the potential for harassment, threats and physical harm, have noted that those risks are always present for public figures like police, judges, and politicians, but are the result of criminal conduct unconnected to a requirement that federal agents identify themselves. *See United States v. California*, 819 F. Supp. 3d 1109, 1126-27 (C.D. Cal. 2026), *reversed on other grounds*, 173 F.4th 1060 (9th Cir. 2026); *see also* Shuchart Decl. ¶¶ 27, 30 (former ICE official stating that threats, assaults, and harassment of federal agents have long pre-dated recent prevalence of agent masking).

At bottom, the Face Coverings and Identification Provisions are valid criminal statutes enacted under New York's core police powers for the protection of the State's residents and resources. *See, e.g.*, *Buchanan v. Warley*, 245 U.S. 60, 74 (1917) ("The authority of the state to pass laws in the exercise of the police power, having for their object the promotion of the public health, safety and welfare is very broad."); *Bond v. United States*, 572 U.S. 844, 857 (2014) (ability of the States to enact criminal laws to protect the safety of its residents is "[p]erhaps the clearest example of traditional state authority"). Just as "the national government cannot be made to tolerate undue interference from the states in the enforcement of federal law," "neither should any

---

*Shootings Unravel in Court*, N.Y. Times (Feb. 10, 2026), https://tinyurl.com/375x9zcf (detailing instances where federal claims of assault were discredited in court).

state be made to tolerated unwarranted interference with its duty to protect the health and welfare of its citizens." *Kentucky v. Long*, 837 F.2d 727, 749 (6th Cir. 1988). Because the challenged provisions result in no "crippling obstruction of any the [federal] Government's functions, [and] no sinister effort to hamstring its power," but at most only incidentally burdens it, they do not directly regulate the federal government in violation of intergovernmental immunity. *City of Detroit v. Murray Corp. of Am.,* 355 U.S. 489, 495 (1958). Plaintiff, therefore, is not likely to succeed on the merits, and its motion for a preliminary injunction should be denied.

### 2.    This Court need not follow the Ninth Circuit's minimally reasoned interlocutory order

In advancing its intergovernmental immunity claim, plaintiff misplaces its reliance on the Ninth Circuit's recent brief interlocutory decision finding that a California law that required law enforcement to display identification constituted impermissible direct regulation of the federal government. *See* Pl.'s Br. at 12-14. In that case, a panel of the Ninth Circuit suggested—in a single paragraph, without analysis—that intergovernmental immunity bars the application of generally applicable state laws to federal actors so long as those laws touch on "federal governmental functions in any manner and to any degree." *United States v. California*, 173 F.4th 1060, 1068 (9th Cir. 2026) (direct regulation occurs any time state laws "regulates conduct reserved to sovereigns"). But the decades of settled precedents from the Supreme Court (and other courts) simply do not support the novel proposition announced by the Ninth Circuit. *See, e.g.*, *Johnson*, 254 U.S. at 56; *Texas*, 123 F.4th at 206. Nor did the Ninth Circuit panel identify any precedent for its newly-created rule.[9]

---

[9] Plaintiff's reliance on the more recent out-of-district cases from Philadelphia and Virginia is similarly unavailing because those cases simply repeated the Ninth Circuit's legally erroneous analysis of the intergovernmental immunity doctrine.

In addition, the Ninth Circuit's erroneous reasoning is in tension with this Court's prior (and legally correct) decision upholding New York's Protect Our Courts Act ("POCA") against an intergovernmental immunity challenge. The Protect Our Courts Act prohibits civil warrantless arrests—including those conducted by federal immigration officials—of witnesses and parties when attending court proceedings and while traveling to and from those proceedings. *New York (POCA)*, 810 F. Supp. 3d at 336. Applying the Ninth Circuit's analysis, because immigration arrests pertain to a "federal governmental function" and because POCA prohibits the federal government from conducting arrests in certain places—including outside of state courthouses—it was necessarily invalid as an impermissible direct regulation. But that is not what this Court held in rejecting plaintiff's intergovernmental immunity claim after faithfully applying the applicable precedents requiring actual "control" over federal duties. *Id.* at 352.

Like POCA, the Face Coverings and Identification Provisions do not prohibit the federal government from enforcing the immigration laws. At best, the challenged provisions requiring that all law enforcement officers not conceal their identities when interacting with the public impose "a very narrow limitation on federal enforcement authority that is tailored to protect states' interests." *State of New York v. U.S. Immigration & Customs Enforcement*, 431 F. Supp. 3d 377, 393 (S.D.N.Y. 2019). Nor do the Face Coverings and Identification Provisions impose anything more than incidental burdens "that the intergovernmental immunity doctrine considers problematic." *New York (POCA)*, 810 F. Supp. 3d at 354.

### 3. The 287(g) Provisions Do Not Violate Intergovernmental Immunity

Contrary to plaintiff's claims (Pl.'s Br. at 14-17), prohibiting state and local authorities from providing assistance to federal immigration enforcement does not directly regulate or discriminate against the federal government. As an initial matter, the 287(g) Provisions do not

16

directly regulate the federal government because their plain terms apply to prohibit the actions of state and local authorities, Exec. Law §§ 170-k(2)(i), (7)(b), and not any conduct on the part the federal government. *See McHenry Cnty. v. Raoul*, 44 F.4th 581, 592-93 (7th Cir. 2022) (state law barring state and local officials from entering into or maintain agreements for immigration detention does not directly regulate federal government); *New York (Green Light)*, 814 F. Supp. 3d at 281 (prohibitions directed to state officials do not regulate federal government).

And notwithstanding the 287(g) Provisions, plaintiff remains free to conduct its immigration enforcement activities, as it has done (and will continue to do) in the vast majority of the State without any assistance from local authorities and without any 287(g) cooperation agreements. *See* Decl. of Bryan Flanagan (ECF No. 4-6) ¶ 26 (listing only 11 counties and localities in New York with active 287(g) agreements). That plaintiff will have to expend more of its abundant resources—including the recent substantial appropriations—to enforce the immigration laws without assistance from local authorities is "insufficient to establish direct regulation of the federal government." *New York (POCA)*, 814 F. Supp. at 281.

Similarly, the 287(g) Provisions do not improperly discriminate against the federal government. As the Supreme Court has explained, for purposes of an intergovernmental immunity claim, "the State does not discriminate against the Federal Government . . . unless it treats someone else better than it treats them." *Washington*, 460 U.S. at 544-45; *Dawson v. Steager*, 586 U.S. 171, 177 (2019) (differential treatment of "similarly situated state and federal [actors]" violates intergovernmental immunity). The 287(g) Provisions do not treat any similarly-situated actors better than they treat federal actors. Instead, the challenged provisions are focused on prohibiting state and local assistance for a particular activity—that is, enforcement of the federal immigration laws. As the Seventh Circuit explained, that a state regulation "affects an exclusively federal

17

domain" is insufficient to state an intergovernmental immunity claim, absent a showing of disparate treatment of "similarly situated" actors. *See McHenry Cnty.*, 44 F.4th at 594 (rejecting intergovernmental immunity claim asserted against state law prohibiting 287(g) agreements).

Plaintiff has failed to identify any similarly situated actors for purposes of the 287(g) Provisions. Thus as this Court has recently held in rejecting a similar intergovernmental immunity claim: "the fact that a law affects an exclusively federal domain is not evidence of discrimination, and failure to identify a comparator ends the inquiry." *New York (POCA)*, 810 F. Supp. 3d at 353.

On the other hand, invalidating the 287(g) Provisions in this case based on intergovernmental immunity principles "would imply that [New York] *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule." *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (emphasis in original). Such a result would also be directly inconsistent with federal law expressly providing states and localities with the option, not the obligation, to enter into 287(g) agreements—and making clear that conduct under those agreements must be consistent with State and local law. 8 U.S.C. § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection"), (g)(1) (providing that state and local authorities may provide assistance "at the expense of the State or political subdivision and to the extent consistent with State and local law"); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all.").

18

**B.    Plaintiff's Remaining Challenges to the 287(g) Provisions Are Also Meritless**

**1.    Federal Law Does Not Preempt the 287(g) Provisions**

The only theory of preemption asserted by plaintiff here is conflict preemption. *See* Compl. ¶¶ 129-133, 153. This theory of preemption requires plaintiff to demonstrate that "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). To invalidate a state law based on conflict preemption "in areas of law traditionally occupied by the states," "the conflict between state law and federal policy must be a 'sharp' one." *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007).

Here, plaintiff has no likelihood of success of its preemption claim because no conflict— sharp or otherwise—exists between the 287(g) Provisions and federal law. To the contrary, the plain text of the INA addressing 287(g) agreements merely gives States the option to enter into such agreements, but acknowledges that states may pass laws prohibiting such agreements. *See* 8 U.S.C. § 1357(g)(1) (stating 287(g) agreements may be entered into "to the extent consistent with state law"), (g)(9) (providing states and localities are not required to enter into 287(g) agreements). Federal law plainly does not conflict with the State's choice not to exercise that option. *See, e.g.*, *City of El Cenizo*, 890 F.3d at 178 ("Section 1357 does not require cooperation at all."); *California*, 921 F.3d at 889 ("Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities.") (emphasis in original). Courts have consistently upheld state laws and regulations prohibiting state and local cooperation with federal immigration enforcement, whether through 287(g) agreements or through more informal means. *See, e.g.*, *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 382-84 (D.N.J. 2020), *aff'd sub nom Ocean County Bd. of Commrs. v. Attorney General*, 8 F.4th 176, 181-82 (3d Cir. 2021) (New Jersey directive prohibiting 287(g) agreements and informal cooperation); *McHenry Cnty.*, 44 F.4th at

19

594 (Illinois law prohibiting 287(g) agreements).

The challenged provisions' prohibition on 287(g) agreements is an appropriate exercise of the State's legislative authority and is consistent with the INA. It is well established that municipalities and their departments are creatures of state law and that the Legislature, by statute, can direct how municipalities exercise their police powers. *See City of New York v. State*, 86 N.Y.2d 286, 290-91 (1995).

It may be, as plaintiff contends, that Congress had "contemplated cooperation" between federal, state, and local authorities when it enacted the federal immigration laws. *See* Compl. ¶¶ 130-133. But as this Court recently held, such "a hope, however fervent, that federal-state cooperation will occur does not empower the federal government to conscript the States; were it otherwise, the anticommandeering doctrine would cease to exist." *New York (POCA)*, 810 F. Supp. 3d at 351. Indeed, as the Ninth Circuit explained, "when questions of federalism are involved, we must distinguish between expectations and requirements. In [the immigration] context, the federal government was free to *expect* as much as it wanted, but it could not *require* [a State's] cooperation without running afoul of the Tenth Amendment." *California*, 921 F.3d at 890-91 (emphasis in original); *accord McHenry Cnty.*, 44 F.4th at 591-92 ("Congress may have hoped or expected that States would cooperate with" federal immigration enforcement, but "States are not bound by that hope or expectation" in light of the Tenth Amendment). "Here, New York's permissible decision not to assist federal immigration enforcement in its endeavors is not an obstacle to that enforcement effort." *New York (POCA)*, 810 F. Supp. 3d at 351.

### 2.    The 287(g) Provisions Do Not Violate the Contracts Clause

The Constitution's Contracts Clause prohibits any laws "impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Courts have clarified that this "prohibition is not an

20

absolute one," *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934), and "does not trump the police power of a state to protect the general welfare of its citizens, a power which is 'paramount to any rights under contracts between individuals,'" *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367-68 (2d Cir. 2006). Even if a party can make the "threshold" showing that a law has caused "a substantial impairment of" the parties' contract, the statute will still be sustained as against a Contracts Clause challenge where the law reasonably advances "a significant and legitimate public purpose." *Sveen v. Melin*, 138 S. Ct. 1815, 1821-22 (2018).

Plaintiff's claim fails because even assuming that the challenged provisions caused a "substantial impairment" of a contract, they would nonetheless be permissible under the Contracts Clause because they were reasonable measures adopted in furtherance of the State's determination that the safety and welfare of its residents are enhanced through a policy choice not to participate in federal immigration enforcement, which has increasingly implicated abusive and harmful tactics. *See supra* at 6. These are important and valid legislative aims. *See Connecticut State Police Union v. Rovella*, 36 F.4th 54, 64 (2d Cir. 2022) (addressing law enforcement misconduct was legitimate "broad societal goal" for Contracts Clause purposes). And as this Court has recognized, the State's choice not to participate in federal immigration enforcement is permissible under the Tenth Amendment. *New York (POCA)*, 810 F. Supp. 3d at 354-55.

Plaintiff's disagreement (Pl.'s Br. at 18) about the Legislature's policy judgment is not a basis for federal courts to second-guess state determinations of how best to protect the public welfare and how state and local resources should be expended. *See Blaisdell*, 290 U.S. at 447-48 ("Whether the legislation is wise or unwise as a matter of public policy is a question with which we are not concerned."). This Court should defer to the State's reasoned determinations that the 287(g) Provisions are appropriate means of furthering the State's legitimate interests.

21

## II.    PLAINTIFF HAS FAILED TO DEMONSTRATE THAT IT WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023). A movant's failure to satisfy this requirement is fatal and courts need not consider the other requirements before denying preliminary relief. *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). "To satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).

Plaintiff has not clearly shown it would suffer imminent, irreparable harm absent an injunction. For the Face Coverings and Identification Provisions, plaintiff's claims of irreparable harm consist of allegations that complying with the state laws will expose federal agents to greater safety risks by publicly disclosing their identities and reduce "operational effectiveness," and potentially subject to state criminal prosecutions. Pl.'s Br. at 21-22.

As a threshold matter, plaintiff has failed to establish that any of the challenged provisions are currently impacting federal operations, or that a single individual law enforcement officer has actually been chilled or deterred from engaging in their official duties. Notably, several of plaintiff's declarants, including those from the FBI or DEA, conspicuously do not state that their agents wear face coverings or otherwise conceal their identities and agency affiliations during routine public-facing operations. And plaintiff's own submissions—wherein it has declared that federal law enforcement agencies "will not comply with the challenged laws" (*e.g.*, Compl. ¶ 94)—undermine any claim that any federal official has been chilled in carrying out their federal duties. Recent reports of immigration enforcement activities occurring in the State since the Face

22

Coverings and Identification Provisions have taken effect likewise confirm that some immigration agents are not complying with state law and are continuing to conduct their operations while concealing their identities.[10] Even if federal agents were chilled in carrying out their duties, any such chill does not satisfy the requisite irreparable harm because federal law enforcement officials have no constitutional right to conceal their identities when performing their official duties when interacting with the public. *See Urquilla-Ramos*, 821 F. Supp. 3d at 616 (finding "use of masked agents to effect a civil immigration detention . . . unreasonable and unconstitutional").

Separately, the harms plaintiff alleges resulting from the 287(g) Provisions—namely, that the federal government will have to expend more resources on immigration enforcement in the absence of local assistance (Pl.'s Br. at 22-23)—are likewise not irreparable. These are the same harms that other courts (including this Court) have consistently rejected as legally insufficient even to state an intergovernmental immunity or preemption claim. *See, e.g.*, *McHenry Cnty.*, 44 F.4th at 592; *United States v. Illinois*, 796 F. Supp. 3d 494, 531-32 (N.D. Ill. 2025); *New York (POCA)*, 810 F. Supp. 3d at 354-55. And plaintiff's failure to seek preliminary relief challenging other statutes and executive orders in any of those prior cases alleging the same harms cannot be reconciled with its present claim that these alleged harms are irreparable here. In any event, the federal government does not have a constitutional right to demand that state and local entities contract to provide assistance with immigration enforcement. To the contrary, as this Court has concluded, the Tenth Amendment permits States and localities to decline to assist with federal enforcement efforts. *See, e.g.*, *New York (POCA)*, 810 F. Supp. 3d at 354-55.

---

[10] *See, e.g.*, https://x.com/letsgetatter/status/2075179751908466816?s=46 (July 9, 2026) (recent video posted of apparent ICE arrest in Brooklyn); Daniel Curren, *Growing Concerns Over Increased ICE Presence in Broome County*, 12 News (July 9, 2026), https://tinyurl.com/yc55ukyc (video of ICE arrest showing some agents wearing masks).

Plaintiff is also mistaken in contending (Pl.'s Br. at 12) that a likelihood of a Supremacy Clause violation constitutes *per se* irreparable harm for purposes of this motion. "[T]he Supremacy Clause, of its own force, does not create rights." *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 389 (E.D.N.Y. 2021). And in all events, whether the Supremacy Clause confers immunity on any given set of facts can be assessed in particular applications. *See Tanella*, 374 F.3d at 147-48. Because plaintiff cannot demonstrate any irreparable harm, it is not entitled to preliminary relief irrespective of whether it is likely to succeed on the merits of its claims.

## III.    THE PUBLIC INTEREST VASTLY OUTWEIGHS ANY HARMS TO PLAINTIFF

The balance of equities and consideration of the overall public interest tip decisively against a preliminary injunction. Enjoining the Face Coverings and Identification Provisions and the 287(g) Provisions would deprive the State and its residents of the protections of those duly-enacted laws. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) ("[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury"). Here, the Legislature enacted the challenged laws to protect public safety, promote transparency and accountability in all law enforcement operations in the State, and to ensure that limited state and local resources are not expended on civil immigration enforcement efforts that harm the State's communities and residents. *See supra* at 6. Indeed, as other courts have recognized, the effect of masked federal agents "snatching" individuals off the streets has "terrorize[d]" communities and "caused fear in citizens and non-citizens alike." *American Ass'n of Univ. Professors*, 802 F. Supp. 3d at 174, 162 n.30; *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 64 (D.D.C. 2025) (finding that agents making arrests without identifying themselves instills fear and harms the public). The State is not required to ignore these unwarranted federal intrusions on its sovereign duty to protect its residents.

24

Under these circumstances, the Legislature reasonably determined that allowing local law enforcement involvement in civil immigration enforcement harms public safety because such cooperation makes immigrant communities more likely to avoid police interactions, including reporting crime or testifying as witnesses, out of fear that this reporting will result in questioning about their own immigration status or that of others. *See New York (POCA)*, 810 F. Supp. 3d at 341 (citing *City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018)) (recognizing harms). At the same time, it was also reasonable for the State to conclude that the imposition of federal immigration priorities on state and local law enforcement can detract from law enforcement's focus on crime prevention, impose significant costs on the State and its municipalities, and divert already limited resources away from public safety efforts. *See supra* at 6.

Plaintiff is not entitled to an order enjoining the challenged laws as applied to the federal government, and restraining the Governor and the Attorney General from discharging their statutory and constitutional obligations to ensure that the State's laws are carried out by officials charged with doing so. This is so especially where there is no federal law or policy requiring federal law enforcement officers to conceal their identities or their law enforcement affiliations when conducting their official duties in interacting with the public. Nor does any provision of federal law obligate state and local government entities to contract with the federal government to provide assistance with civil immigration enforcement. Balanced against the questionable claims of federal officer safety and increased operational burdens, it would be against the public interest to grant the extraordinary preliminary relief plaintiff seeks.

## CONCLUSION

The Court should deny the motion for a preliminary injunction.

Dated:    New York, New York
           July 17, 2026

Respectfully submitted,

LETITIA JAMES
 *New York State Attorney General*
Attorney for Defendants

By:   /s/ Linda Fang      
      Linda Fang
      Special Litigation Counsel
      28 Liberty Street
      New York, New York 10005
      (212) 416-8580