**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

                          **Plaintiff,**

   **vs.**                                              **1:26-CV-1360**
                                                         **(MAD/ML)**

**STATE OF NEW YORK, KATHY HOCHUL,**
**and LETITIA JAMES**

                          **Defendants.**

---

**APPEARANCES:**                                **OF COUNSEL:**

**U.S. DEPARTMENT OF JUSTICE,**          **BRANDON D. NEUMAN, ESQ.**
**CIVIL DIVISION**                               **LUKE A. MILLER, ESQ.**
950 Pennsylvania Ave NW                   **SEAN SKEDZIELEWSKI, ESQ.**
Washington, District of Columbia 20530
Attorneys for Plaintiff

**NEW YORK STATE OFFICE OF**             **LINDA FANG, AAG**
**THE ATTORNEY GENERAL**
28 Liberty Street
New York, New York 10005
Attorney for Defendants

**BALLARD SPAHR LLP**                    **LYNN OBERLANDER, ESQ.**
1675 Broadway - 19th Floor
New York, New York 10019
Attorney for Amicius Citizens for
Responsibility and Ethics in Washington

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff the United States of America ("Plaintiff" or the "United States") brings facial

challenges to certain provisions of New York Senate Bill S9005C, signed into law by Governor

Kathy Hochul on May 27, 2026 (hereinafter the "Budget Act").  *See* Dkt. No. 1; 2026 N.Y. Sess. Law ch. 55, S. 9005-C.  Specifically, the United States Challenges provisions in the Budget Act which: (1) amend the New York Civil Rights Law to add §§ 100, 101, and 102; and (2) amend the New York Executive Law to add § 170-k.  *See* Dkt. No. 1 at ¶¶ 3-14; 2026 N.Y. Sess. Law ch. 55, pt. LL, subps. A, F.  Generally, Civil Rights Law § 101 prohibits law enforcement officers, including federal law enforcement officers, from wearing facial coverings in certain circumstances (the "Face Covering Act"), Civil Rights Law § 102 requires law enforcement officers, including federal law enforcement officers, to wear certain visible identification (the "Identification Act"), Civil Rights Law § 100 contains definitions of terms used in the Face Covering and Identification Acts, and Executive Law § 170-k terminates existing and future agreements made pursuant to 8 U.S.C. § 1357(g) (the "Termination Act" and, collectively with the Face Covering and Identification Acts, the "Challenged Acts").  *See* N.Y. Civ. Rights Law §§ 100-02; N.Y. Exec. Law § 170-k.  The Face Covering and Identification Acts took effect on June 26, 2026, while the relevant portion of the Termination Act is effective on August 25, 2026.  *See* 2026 N.Y. Sess. Law ch. 55, pt. LL, subp. F, § 3; N.Y. Exec. Law § 170-k(7).

At this stage, the United States seeks a preliminary injunction enjoining Defendants the State of New York, Governor Kathy Hochul, and Attorney General Letitia James from enforcing the Challenged Acts.  According to the United States, the Challenged Acts "violate principles of intergovernmental immunity and are invalid under the Supremacy Clause because they unlawfully regulate or discriminate against the Federal Government[,]" violate the Contracts Clause, or are preempted by federal law.  Dkt. No. 4-1 at 9.  Defendants oppose the United States' motion and *amicus curae* Citizens for Responsibility and Ethics in Washington have expressed support for

Defendants' position. *See* Dkt. Nos. 31-1, 34. Plaintiff has filed a reply in support of its application for preliminary injunctive relief. *See* Dkt. No. 38.

For the reasons that follow, the Court grants in part and denies in part the United States' motion for preliminary injunction.

## II. BACKGROUND

### A. Procedural History

Plaintiff initiated this action in the Western District of New York on June 22, 2026 and filed a motion for preliminary injunction on June 23, 2026. *See* Dkt. Nos. 1, 4. Plaintiff requested that an expedited hearing be held on the motion for preliminary injunction on or before the effective date of the Face Covering and Identification Acts. *See* Dkt. No. 5. However, on June 23, 2026, Defendants filed a motion to transfer the case and to dismiss Defendant Michael Russo. *See* Dkt. No. 8. On July 10, 2026, the presiding judge in the Western District granted Defendants' motions, dismissing Defendant Russo and transferring this matter to the Northern District of New York. *See United States v. Russo*, No. 26-CV-1283, 2026 WL 1998330, *7 (W.D.N.Y. July 10, 2026). This matter was docketed in the Northern District on July 13, 2026 and has been assigned to the undersigned. *See* Dkt. Nos. 22, 25.

On July 13, 2026, Defendants were ordered to show cause before this Court on Tuesday, July 21, 2026, why a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, should not be issued enjoining Defendants, their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of the Defendants, from enforcing Civil Rights Law §§ 100-02 and Executive Law § 170-k against the Federal Government. *See* Dkt. No. 26. Defendants filed answering papers on July 17, 2026, and Plaintiff's reply papers were filed on July 20, 2026. *See* Dkt. Nos. 34, 38. On July 21, 2026, a

show cause hearing was held and this Court heard arguments from both sides in support of their respective positions.

**B.    The Challenged Acts**

### *1. The Face Covering and Identification Acts*

The Face Covering and Identification Acts prohibit "law enforcement officers" from wearing certain face coverings and require them to visibly display certain identifying information. *See* N.Y. Civ. Rights. Law §§ 101-02.  For purposes of both Acts, "law enforcement officer" means, as relevant here, "any federal law enforcement officer, as defined in section 2.15 of [New York's] criminal procedure law." *Id.* § 100(2)(c).  Thus, for purposes of these provisions, "law enforcement officer" includes, *inter alia*, Federal Bureau of Investigation ("FBI"), Immigrations and Customs Enforcement ("ICE"), Drug Enforcement Administration ("DEA"), and United States Customs and Border Protection ("CBP") officers and agents.  *See* N.Y. Crim. Proc. Law § 2.15.

Specifically, the Face Covering Act prohibits law enforcement officers from "wear[ing] any face covering that conceals, disguises, or obscures their facial identity while interacting with the public in the performance of their duties . . . ."  N.Y. Civ. Rights Law § 101(1).  The Act defines "face covering" as "any item that is used to conceal, disguise, or obscure the facial identity, including any opaque mask, garment, helmet, headgear, balaclava, ski mask, neck gaiter, or tactical mask." *Id.* § 100(1).  This definition expressly excludes:

> (a) a transparent face shield;
>
> (b) a medical grade surgical mask or N95 respirator worn to prevent the transmission of diseases or illnesses;

(c) a mask or apparatus worn to protect against imminent exposure to any toxins, gas, smoke, or other hazardous or harmful environmental condition;

(d) a mask, helmet, self-contained breathing apparatus, or other device necessary when worn to perform duties related to a water rescue operation;

(e) a motorcycle helmet when worn by an individual using a motorcycle or other vehicle that requires a helmet for safe operations;

(f) necessary protective eyewear;

(g) ballistic gear worn for the purposes of physical safety;

(h) camouflage gear worn for the purposes of blending in to a physical environment;

(i) a mask or disguise worn for the purposes of active undercover operations;

(j) a garment worn for religious purposes;

(k) sunglasses;

(l) facial hair; or

(m) any other item worn to follow applicable laws on occupational health and safety, reasonable workplace accommodations, or to protect the skin from frostbite during conditions that the law enforcement officer reasonably thinks could cause frostbite.

*Id.*

The Identification Act requires law enforcement officers to visibly identify themselves in certain ways, depending on whether they are in uniform. Specifically, "[a]ny uniformed law enforcement officer" must "visibly display . . . (a) the name of the agency or department employing such officer; and (b) at least one form of identification of the officer, such as the officer's name, badge number, or shield number" when "interacting with the public in the

5

performance of their duties." *Id.* § 102(1). And "[l]aw enforcement officers who are not uniformed while interacting with the public in the performance of their duties" are required to "wear at least one visibly identifying agency-issued or department-issued logo, patch, emblem, insignia, or other external identifier clearly identifying such officer as a law enforcement officer within such agency or department acting under color of law." *Id.* § 102(2). For purposes of the Identification Act, "'[v]isibly display' means to wear externally on the uniform in a size and location that is reasonably visible to members of the public with whom the officer interacts[.]" *Id.* § 102(4).

The Identification Act expressly does not apply to "officers engaged in active undercover operations, covert surveillance, other investigative activities where identification would compromise such investigation, or protective detail assignments for a designated person or location where visible identification would materially increase a security risk to the officer or the protected individual" or "officers using personal protective equipment required for medical or emergency response purposes, where such equipment temporarily prevents visible display of identification." *Id.* § (3)(a)-(b).

"Any person who willfully violates" the Face Covering or Identification Acts "shall for a first offense be guilty of a violation and each subsequent offense shall be guilty of a misdemeanor." *Id.* §§ 101(2), 102(5). Under New York Penal Law, a violation is punishable by up to fifteen days in jail and a misdemeanor is punishable by up to one year in jail. *See* N.Y. Penal Law § 70.15.

### 2. The Termination Act

The Termination Act prohibits any "local government, law enforcement agency,

correctional facility, local correctional facility, juvenile detention facility, or facility for youth placed with or committed to the office of children and family services, or agent thereof" from entering, modifying, renewing, remaining in, or extending (1) "any agreement pursuant to section 287(g) of the Immigration and Nationality Act" with the Federal Government ("287(g) Agreements"); or (2) "any contract, intergovernmental service agreement, or any other formal or informal agreement to house or detain individuals for federal civil immigration violations, including, but not limited to, agreements entered into pursuant to 8 U.S.C. § 1103(a) or § 1231(g)." N.Y. Exec. Law § 170-k(2)(a).

When the Termination Act becomes effective on August 25, 2026, any contract or agreement identified in the Act, including 287(g) Agreements, "shall be deemed not consistent with state law and any such agreement . . . shall be void and unenforceable," and "any law enforcement agency, correctional facility, local correctional facility, juvenile detention facility, or facility for youth placed with or committed to the office of children and family services, or agent thereof shall exercise any applicable termination provision contained in such agreement." *Id.* § 170-k(7)(a).

### i. 287(g) Agreements

Pursuant to the Immigration and Nationality Act ("INA"), the Attorney General of the United States "can exercise discretion to issue a warrant for an alien's arrest and detention 'pending a decision on whether the alien is to be removed from the United States.'" *Arizona v. United States*, 567 U.S. 387, 407 (2012) (quoting 8 U.S.C. § 1226(a)). Although the INA gives federal officers significant discretion to apprehend individuals believed to be removable aliens, "federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 408. Section 287(g) of the INA, codified at 8 U.S.C. 1357(g),

7

enables the Secretary of Homeland Security[1] to authorize certain state or local officers to "perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States . . . at the expense of the State or political subdivision and to the extent consistent with State and local law " when the Secretary has entered into a written agreement with the relevant state or local entity.  8 U.S.C. § 1357(g)(1).

The statute further "require[s] that an officer or employee . . . performing a function under the agreement shall have knowledge of, and adhere to, Federal law relating to the function," and that these "officers or employees . . . receive[] adequate training regarding the enforcement of relevant Federal immigration laws."  *Id.* § 1357(g)(2).  State or local officers covered by 287(g) Agreements "are subject to the [Secretary's] direction and supervision."  *Arizona*, 567 U.S. at 409.  "In short, Section 287(g) 'permits ICE to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement,' and 'ICE trains the local law enforcement officers who participate.'"  *United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023) (quoting *United States v. Sosa-Carabantes*, 561 F.3d 256, 257 (4th Cir. 2009)).  Section 287(g) also permits local law enforcement "to cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States" without a formal agreement.  8 U.S.C. § 1357(g)(10)(B).

**C.      Plaintiff's Claims**

The complaint alleges five claims against Defendants related to the passage of the Challenged Acts.  *See* Dkt. No. 1 at ¶¶ 134- 54.  Claim One alleges that the Face Covering and

---

[1]  As Plaintiff points out, although the statute refers to the Attorney General, "[f]ollowing the Homeland Security Act of 2002, many references in the INA to the 'Attorney General' are now read to mean the Secretary."  Dkt. No. 4-1 at 11 n.1 (citing *Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005)).  Defendants do not contest this assertion.  Thus, the Court accepts Plaintiff's representation that these sections of the INA now refer to the Secretary of Homeland Security.

Identification Acts are unlawful regulation of the Federal Government in violation of the Supremacy Clause. *See id.* at ¶ 134-39. Claim Two alleges that the Termination Act is an unlawful regulation of the Federal Government in violation of the Supremacy Clause. *See id.* at ¶¶ 140-42. Claim Three alleges that the Termination Act unlawfully discriminates against the Federal Government "by singling the Federal Government out expressly and impliedly for termination of 287(g) [A]greements when other law enforcement agencies who enter into agreements with New York are not so treated" in violation of the Supremacy Clause. *Id.* at ¶¶ 143-45. Claim Four alleges that the Termination Act substantially impairs Federal Government contracts in violation of the Contracts Clause. *See id.* at ¶¶ 146-51. Claim Five alleges that the Termination Act creates an unlawful obstacle to the Federal Government in accomplishing its objectives in violation of the Supremacy Clause. *See id.* at ¶¶ 152-54.[2]

### III. DISCUSSION

**A.    Standard of Review**

"'A preliminary injunction is an extraordinary and drastic remedy' and 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (quoting *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024)). "To obtain a preliminary injunction, a party must show '(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance

---

[2] The United States argues that it has pre-enforcement standing. *See* Dkt. No. 4-1 at 17-19. Defendants do not challenge the United States' standing. *See generally*, Dkt. No. 34. Thus, the Court is satisfied that the United States has demonstrated pre-enforcement standing. *See United States v. City of Philadelphia*, No. 26-CV-4208, 2026 WL 1906075, *8 (E.D. Pa. July 2, 2026) (holding the United States demonstrated pre-enforcement standing to bring similar claims); *United States v. Virginia*, No. 3:26-CV-545, 2026 WL 1909995, *9 (E.D. Va. July 2, 2026) (same).

of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.'" *Id.* (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).  Where, as here, the movant seeks to enjoin government action "taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous 'serious questions' standard but should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that [it] will succeed on the merits of [its] claim." *Hunter v. Cortland Hous. Auth.*, 714 F. Supp. 3d 46, 56 (N.D.N.Y. 2024) (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)); *see Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014).[3]

**B.      Likelihood of Success on the Merits**

---

[3]  The Second Circuit has articulated two other heightened standards that may be applicable at the preliminary injunction phase.  Neither is applicable here and Defendants do not argue otherwise. First, "both a 'clear or substantial' likelihood of success and a 'strong' showing of irreparable harm' . . . is required when the requested injunction (1) would provide the movant with all the relief that is sought and (2) could not be undone by a judgment favorable to non-movant on the merits at trial." *Nat'l Fuel Gas Distrib. Corp. v. Christian*, 798 F. Supp. 3d 267, 279 (N.D.N.Y. 2025) (quoting *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35, n.4).  Although the injunctive relief requested arguably would provide the United States with all of the relief it seeks, this heightened standard is inapplicable because a final judgment in Defendants' favor would permit the enforcement of the Challenged Acts and undo any preliminary relief.  Second, when the preliminary injunction is "mandatory" in that it would "alter the status quo by commanding some positive act," as opposed to being "prohibitory" by seeking only to maintain the status quo, the movant must make "a clear showing that the moving party is entitled to the relief requested, or [demonstrate] extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (internal quotation marks omitted).  This heightened standard is also inapplicable because the United States seeks to maintain the status quo—which existed before the Challenged Acts were signed into law—not alter it. *See Christian*, 798 F. Supp. 3d at 279 ("As for the point in time that serves as the status quo, the Second Circuit has defined this point in time as 'the last actual, peaceable uncontested status which preceded the pending controversy'") (quoting *LaRouche v. Kezer*, 20 F.3d 68, 74, n.7 (2d Cir. 1994)).

The United States contends that the Face Covering and Identification Acts violate the intergovernmental immunity doctrine derived from the Supremacy Clause "because they purport to regulate the Federal Government directly by defining 'federal law enforcement officer' to specifically include FBI, DEA, ICE, and CBP officers and agents, and by applying its provisions relating to facial coverings and identification to them."  Dkt. No. 4-1 at 19 (quoting N.Y. Civ. Rights Law § 100(2)(c)).  As for the Termination Act, the United States argues that it (1) "likewise violates principles of intergovernmental immunity by regulating and discriminating against the Federal Government"; (2) "impairs the Federal Government's contracts," in violation of the Contracts Clause; and (3) "creates an obstacle to the implementation of Federal law, in violation of the Supremacy Clause[.]"  *Id.*

### 1.  *The Supremacy Clause and Intergovernmental Immunity—Claim One*

"[O]ur Constitution establishes a system of dual sovereignty between the States and the Federal Government."  *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).  The Supremacy Clause states that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Two doctrines—similar in nature, but critically distinct—are born from the Supremacy Clause: intergovernmental immunity and preemption.  First, the intergovernmental immunity doctrine shields the Federal Government from some State regulation.  *See United States v. Washington*, 596 U.S. 832, 838-39 (2022). "Second, Congress can extend that immunity further by passing a federal law to preempt state laws."  *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025) (citing *North Dakota v. United States*, 495 U.S. 423, 439-40 (plurality)).

To begin, the Court must frame the Supremacy Clause challenge brought by the United States.  Defendants argue that the United States' challenge to the Face Covering and Identification Acts fails because there is "no federal requirement that conflicts with the state laws challenged here."  Dkt. No. 34 at 16.  This argument sounds in preemption.

Based upon the record before this Court, it appears that a preemption challenge to the Face Covering and Identification Acts would fail.  Under the preemption doctrine, "[s]tate action may be foreclosed by express language in a congressional enactment, . . . by implication from the depth and breadth of a congressional scheme that occupies the legislative field, . . . or by implication because of a conflict with a congressional enactment[.]"  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (internal citations omitted).

There is no federal law or regulation that requires federal law enforcement officers to wear facial coverings or to conceal their employing agency, name, or badge number while exercising federal law enforcement duties.  In fact, there exist federal laws and regulations which require visible identification in certain circumstances.  *See, e.g.*, 10 U.S.C. § 723(a) (requiring federal law enforcement personnel to visibly display their name or other identifier and the name of the federal agency they serve when responding to a civil disturbance); 8 C.F.R. § 287.8(c)(2)(iii)(A) (2025) (DHS regulations requiring ICE agents to identify themselves as immigration officers at the time an arrest is made).  As was made abundantly clear during the show cause hearing, *see* Dkt. No. 45 at 4-15, the United States can point to no federal law or agency policy which affirmatively requires law enforcement officers to wear facial coverings for the purpose of concealing their identity.  Moreover, the United States has furnished no federal law or agency policy which prohibits federal law enforcement officers from wearing visible identification as required by the Identification Act.

However, Defendants' preemption arguments are misplaced because the United States invokes the intergovernmental immunity doctrine.  To accept Defendants' argument that the United States' challenge to the Face Covering and Identification Acts fails for lack of a conflicting federal statute would ignore the critical distinctions between intergovernmental immunity and preemption, impermissibly collapsing the doctrines into one.  A statute preempting state law is "'unnecessary'" where the intergovernmental immunity doctrine invalidates a state's regulation. *CoreCivic*, 145 F.4th at 328 (citation omitted).  "[I]ntergovernmental immunity has independent bite, and courts must apply it to referee 'clashing sovereignty.'" *Id.* (quoting *McCulloch v. Maryland*, 17 U.S. 316, 430 (1819)).  To answer the question before the Court, then, the boundaries of the intergovernmental immunity doctrine must be explored.

The intergovernmental immunity doctrine is derived from the Supreme Court's decision in *McCulloch v. Maryland*, which established that "states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. at 436.  Of course, states remain sovereign, but they are "subordinate to, and may be controlled by the constitution of the United States." *Id.* at 427.

As described by the Supreme Court in 2022, the intergovernmental immunity doctrine "generally immunizes the Federal Government from state laws" that either (1) "directly regulate" or (2) "discriminate against it." *Washington*, 596 U.S. at 835 (citation omitted).  Under this doctrine, the "activities" of the Federal Government are "shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) (citation omitted); *see*

13

*Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state").

The United States argues that the Face Covering and Identification Acts are unlawful direct regulations because they seek "to regulate the manner and conditions under which federal officers must operate when conducting their official duties and enforcing the law." Dkt. No. 4-1 at 22. In opposition, Defendants contend that these provisions are a legitimate exercise of New York's police powers and that they do not run afoul of intergovernmental immunity because they "do not dictate, interfere with, or otherwise control who federal agents may arrest or detain or how those arrests or detentions occur." Dkt. No. 34 at 15. Defendants also argue that these "new minimum identification requirements . . . are consistent with federal law and longstanding federal policy and practice" and "do no more than provide 'the mode of carrying out' federal duties and incidentally burden federal conduct." *Id.* at 15-16 (quoting *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 205 (5th Cir. 2024)).

In its reply briefing, the United States maintains that the Face Covering and Identification Acts violate intergovernmental immunity because (1) the provisions are not generally applicable laws; (2) they are "much more impactful than mere incidental effects"; (3) it is irrelevant whether federal law requires masking because the United States has not brought a preemption claim; (4) "federal law and policies empower agencies and officers to use discretion to determine when to present identification and when to use face coverings," but these provisions strip away that discretion; (5) the fact that the provisions apply to state and local law enforcement officers, in addition to federal officers, does not defeat an intergovernmental immunity challenge; (6) Defendants' intimation that a federal officer could remove a prosecution under these provisions to federal court and raise a Supremacy Clause immunity defense is irrelevant because a violation of

14

intergovernmental immunity ends the inquiry; and (7) a state's police powers cannot circumvent the principles of intergovernmental immunity.  Dkt. No. 38 at 6-14.

Defendants do not suggest that they have congressional authorization to implement and enforce the requirements contained within the Face Covering and Identification Acts against federal law enforcement officers.  And the United States does not argue that these provisions discriminate against it.  Thus, the Court must determine whether the United States has demonstrated a likelihood of success on the merits of its claim that Face Covering and Identification Acts violate the Supremacy Clause by directly regulating the Federal Government.

To reiterate, the Face Covering Act prohibits federal law enforcement officers from "wear[ing] any face covering that conceals, disguises, or obscures their facial identity while interacting with the public in the performance of their duties."  N.Y. Civ. R. Law § 101(1).  And the Identification Act requires federal law enforcement officers to display certain visible identification.  *See id.* § 102(1)-(2).

A state law regulates the United States directly when it "'places [either] a prohibition' or mandate on the [F]ederal [G]overnment."  *CoreCivic*, 145 F.4th at 321 (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976)).  A state law constitutes direct regulation when it "lays hold of" federal officers "in their specific attempt to obey orders and requires qualifications in addition to those that the [Federal] Government has pronounced sufficient."  *Johnson v. Maryland*, 254 U.S. 51, 57 (1920).  Further, a direct regulation is one that imposes conditions upon "a function of government," and regulates "the right to carry on the business" of the federal government.  *Mayo*, 319 U.S. at 447.  As the Supreme Court has elaborated:

> Since the United States is a government of delegated powers, none
> of which may be exercised throughout the Nation by any one state,
> it is necessary for uniformity that the laws of the United States be

15

> dominant over those of any state.  Such dominancy is required also
> to avoid a breakdown of administration through possible conflicts
> arising from inconsistent requirements.  The [S]upremacy [C]lause
> of the Constitution states this essential principle . . . .  A corollary to
> this principle is that the activities of the Federal Government are
> free from regulation by any state. *No other adjustment of competing
> enactments or legal principles is possible.*

*Id.* at 445 (footnote and internal citation omitted) (emphasis added).

To be sure, the Supremacy Clause does not "bar[] all state regulation which may touch the activities of the Federal Government." *Hancock*, 426 U.S. at 179.  "For example, the Supreme Court has suggested that States may impose 'general rules' regulating conduct that any ordinary citizen could perform, like a 'statute or ordinance regulating the mode of turning at the corners of streets.'" *United States v. California*, 173 F.4th 1060, 1068 (9th Cir. 2026) (quoting *Johnson*, 254 U.S. at 56).  What the Supremacy Clause does bar, however, is direct state regulation of the Federal Government. *See Washington*, 596 U.S. at 838.

Thus, the essential question remains: do the Face Covering and Identification Acts directly regulate the Federal Government?  If the answer is yes, these provisions run afoul of the intergovernmental immunity doctrine and are likely unconstitutional.

Four courts have grappled with this question when confronted with intergovernmental immunity challenges to similar state laws.  First, the Central District of California answered no, finding that the United States did not demonstrate a likelihood of success on the merits of an intergovernmental immunity challenge to California laws similar to the Face Covering and Identification Acts. *United States v. California*, 819 F. Supp. 3d 1109, 1117-18, 1126-30 (C.D. Cal. 2026).  In reaching this conclusion, the Central District of California applied "a functional approach" in deciding whether the regulations at issue "interfer[e] with or control[] the operations of the Federal Government." *Id.* at 1126.  Defendants urge the Court to apply this same

16

"functional approach" here and weigh the competing sovereign interests of the United States and the State of New York.  *See* Dkt. No. 34 at 14-16.

However, on appeal of the Central District of California's decision, the Ninth Circuit granted interlocutory injunctive relief, finding that the state *had* likely violated intergovernmental immunity.  *See California*, 173 F.4th at 1068.[4]  The Eastern District of Virginia and the Eastern District of Pennsylvania followed suit.  *See United States v. Virginia*, No. 3:26-CV-545, 2026 WL 1909995 (E.D. Va. July 2, 2026); *United States v. City of Philadelphia*, No. 26-CV-4208, 2026 WL 1906075 (E.D. Pa. July 2, 2026).[5]

Importantly, the Ninth Circuit expressly rejected the Central District of California's functional approach analysis, finding that the district court "asked the wrong question." *California*, 173 F.4th at 1068.  The Ninth Circuit reasoned that "[b]y looking to the degree [the challenged law] interfered with the activities of the United States, the district court applied a standard pertaining to States' regulation of federal contractors and third-party employers, not the standard applicable to direct regulation of governmental activities of the United States." *Id.* (citing *North Dakota*, 495 U.S. at 437 and *United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019)).  Indeed, in *North Dakota*, the case upon which the Central District of California's analysis heavily relied, the Supreme Court expressly stated that the challenged provisions did not regulate

---

[4]  The Ninth Circuit's decision is the only Circuit authority that presently exists on this narrow issue.

[5]  In its appeal before the Ninth Circuit, the United States only sought to enjoin an identification requirement law, not the law prohibiting officers from wearing facial coverings in the performance of their duties.  *See California*, 173 F.4th at 1066 ("Seeking emergency relief, the United States moved for an injunction pending appeal and also requested a temporary 'administrative' injunction.  The motion sought to enjoin only § 10 of the No Vigilantes Act, the statute's identification requirement").  Although the Ninth Circuit did not address the masking prohibition, the two district court decisions that adopted the Ninth Circuit's reasoning have applied it to masking prohibitions as well as identification requirements.

the Federal Government directly because they "operate against suppliers, not the Government, and concerns about direct interference with the Federal Government . . . therefore are not implicated." *North Dakota*, 495 U.S. at 437.  Quoting other precedential cases, the Ninth Circuit explained as follows:

> "Private contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (en banc). "But where, as here, the governmental action is carried on by the United States itself and Congress does not affirmatively declare its instrumentalities or property subject to regulation or taxation, the inherent freedom [from direct regulation] continues." *Mayo*, 319 U.S. at 448.

*California*, 173 F.4th at 1068.

The Ninth Circuit also relied on the Supreme Court's holding in *Johnson v. Maryland*.  *See id.* 1067.  In *Johnson*, the Supreme Court held that a federal postal service employee could not be convicted of violating a state law that required drivers to have a specific state's driver's license because doing so would "lay[] hold of" federal employees and impose an additional qualification that the Federal Government did not require.  *Johnson*, 254 U.S. at 55-57.  In so finding, the Supreme Court distinguished state laws such as driver's license requirements from "general rules that might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets."  *Id.* at 56.  Applying, *Johnson*, the Ninth Circuit found that the California identification mandate "applies exclusively to law enforcement agencies and their officers, including federal law enforcement agencies and federal law enforcement officers," and "thus directly regulates conduct reserved to sovereigns." *California*, 173 F.4th at 1068.  In other words, the state impermissibly regulated federal activity by adding requirements for federal officers while conducting law enforcement activities.

18

Defendants ask this Court to reject the Ninth Circuit's reasoning as flawed. *See* Dkt. No. 34 at 21-22. According to Defendants, "decades of settled precedents from the Supreme Court (and other courts) simply do not support the novel proposition announced by the Ninth Circuit." *Id.* at 21. Defendants are correct that the Ninth Circuit's decision in *California* was somewhat "brief." *Id.* at 21. Nevertheless, this Court finds *California* persuasive and has independently identified reasons, in addition to those expressed by the Ninth Circuit, to reject the application of the "functional approach" analysis in the circumstances presented here.

First, when adopting the "functional approach," the Central District of California failed to consider that, in *North Dakota*, there was no claim that the provision at issue directly regulated the Federal Government. *See North Dakota*, 495 U.S. at 436 ("There is no claim in this case, nor could there be, that North Dakota regulates the Federal Government directly" because the relevant provision regulated a supplier). As explained in more detail below, *North Dakota* involved regulations that incidentally affected, but did not explicitly mention, the Federal Government. *See id.* This distinction is critical in establishing the boundaries of the definition of "direct regulation."

Second, the Central District of California derived its "functional approach" from one specific sentence in *North Dakota*: "The Court has more recently adopted a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *North Dakota*, 495 U.S. at 435 (citing *United States v. Cnty. of Fresno*, 429 U.S. 452, 467-68 (1977); *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985)). The Ninth Circuit accurately distinguished *North Dakota*, noting that the Supreme Court explicitly explained "that the regulations at issue did 'not implicate[]' 'concerns about direct

19

interference with the Federal Government' because they 'operate[d] against suppliers, not the Government.'" *California*, 173 F.4th at 1068 (quoting *North Dakota*, 495 U.S. at 437).  This explanation is sufficient on its own.  But, to address Defendants' arguments, this Court will go a step further and look at the cases from which *North Dakota* derived the "functional approach"— *Fresno*, 429 U.S. 452 and *Garcia*, 469 U.S. 528.

Fresno, like the bulk of intergovernmental immunity cases, involved the imposition of a state tax.  *Fresno*, 429 U.S. at 456.  In *Fresno*, the Supreme Court upheld a state tax on the possessory interests of United States Forest Service employees in their use of government-owned housing located in national forests in California.  *See id.*  The measure of the tax was "the annual estimated fair rental value of the houses, discounted to take into account essentially the same factors considered by the Forest Service in computing the amount that it deducted from the salaries of employees who used the houses."  *Id.*  In holding that the statute did not violate the Supremacy Clause, the Supreme Court found dispositive the fact that the statute taxed only the value of the user's interest and not any interest attributable to the United States.  *See id.* at 466.  As the Court explained, "[t]he 'legal incidence' of the tax . . . [fell] neither on the Federal Government nor on federal property[,]" because it was "imposed solely on private citizens who work for the Federal Government."  *Id.* at 464.  The rule that the Supreme Court relied on, which it derived from its own precedent, "is that the economic burden on a federal function of a state tax imposed on those who deal with the Federal Government does not render the tax unconstitutional so long as the tax is imposed equally on the other similarly situated constituents of the State."  *Id.* at 462 (footnote omitted).[6]

---

[6]  This rule sounds more in the discrimination theory of intergovernmental immunity, which the United States does not raise in its challenge to the Face Covering and Identification Acts. However, at the time *Fresno* was decided, the Supreme Court had not yet made an explicit

The rule relied on in *Fresno* seems inapplicable here.  The "legal incidence" of a state law which commands certain conduct by federal employees in carrying out the functions of their job is significantly different than that of a tax imposed on the possessory interests in improvements on any tax-exempt land, including the interests of private citizens and those who happen to be federal employees alike.

And *Garcia*, the other case cited by *North Dakota*, is not a Supremacy Clause case at all. There, the Supreme Court held "Congress' authority to regulate the States under the Commerce Clause" was limited by "certain underlying elements of political sovereignty . . . deemed essential to the States' 'separate and independent existence.'" *Garcia*, 469 U.S. at 547-48 (quoting *Lane Cnty. v. Oregon*, 7 Wall. 71, 76 (1869)).  *Garcia*, therefore, speaks to the Supreme Court's recognition of state sovereignty in certain contexts, but does little with regard to explaining the limitations of intergovernmental immunity itself.

Turning back to *North Dakota*, after introducing the "functional approach," the Court went on to contextualize this approach in the succeeding two sentences:

> Whatever burdens are imposed on the Federal Government by a
> neutral state law *regulating its suppliers* "are but normal incidents
> of the organization within the same territory of two governments.". .
> .  A state regulation is invalid only if it regulates the United States
> directly or discriminates against the Federal Government or those
> with whom it deals.

*North Dakota*, 495 U.S. at 435 (internal citation omitted) (emphasis added).  Indeed, at issue in *North Dakota* was whether state reporting and labeling requirements for out-of-state liquor

---

distinction between direct regulation and discrimination.  *See Washington*, 596 U.S. at 838 (noting that the intergovernmental immunity doctrine has "evolved" since *Fresno* and that the Supreme Court "later came to understand the doctrine . . . as prohibiting state laws that *either* 'regulat[e] the United States directly *or* discriminat[e] against the Federal Government or those with whom it deals'") (citation omitted) (emphasis in original).

suppliers could be applied to suppliers transporting liquor to a federal military base. *See id.* at 432-33. The regulations did "not restrict the parties from whom the Government may purchase liquor or its ability to engage in competitive bidding," nor did they "require the military to submit to state control or to purchase alcoholic beverage from suppliers within the State or prescribed by the State." *Id.* at 441, 443. Instead, the regulations were "neutral state law[s]" applicable to private parties that happened to also contract with the Federal Government. *See id.* at 435.

Therefore, even absent a lengthy explanation of the cases underlying *North Dakota*'s approach, *North Dakota* itself contemplates application of its "functional approach" in the context of state regulation of third-party contractors and private individuals. Moreover, *North Dakota* is a plurality opinion—"[b]ecause there was 'no rationale common to a majority of the Justices,' only the result of *North Dakota* is binding." *Newsom*, 50 F.4th at 759 (citation and footnote omitted). The Court cannot, in good faith, disregard the context within which the Court pronounced the "functional approach" and apply it blindly.

To be clear, this Court does not question the wisdom of *North Dakota*, nor its applicability in the proper circumstances. The above is merely a closer examination into why the Ninth Circuit was correct in its determination that *North Dakota* established "a standard pertaining to States' regulation of federal contractors and third-party employers, not the standard applicable to direct regulation of governmental activities of the United States." *California*, 173 F.4th at 1068; *see Newsom*, 50 F.4th at 759 ("Private contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself").[7]

---

[7] In recent a decision, this Court recited the "functional approach." *See United States v. New York*, 810 F. Supp. 3d 329, 352 (N.D.N.Y. 2025). However, in *New York*, this Court's analysis did not turn on a precise application of the "functional approach" and the parties did not dispute

22

Defendants also argue that *California*'s analysis cannot be reconciled with *Johnson*, 254 U.S. at 56 and *Texas*, 123 F.4th at 206.  The Court disagrees.

As discussed, the Ninth Circuit specifically addressed *Johnson*, explaining that although "the Supreme Court has suggested that States may impose 'general rules' regulating conduct that any ordinary citizen could perform, like a 'statute or ordinance regulating the mode of turning at the corners of streets.'"  *California*, 173 F.4th at 1068 (quoting *Johnson*, 254 U.S. at 56), "the Supremacy Clause does bar *direct* state regulation of the [F]ederal [G]overnment."  *Id.* (citing *Washington*, 596 U.S. at 838 and *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010)) (emphasis in original).

This portion of Defendants' disagreement with the holding in *California* rests on their argument that the Face Covering and Identification Acts are "generally applicable" rules which do not prevent federal officers from making arrests or otherwise enforcing federal law.  Dkt. No. 34 at 8, 15, 21.  On the contrary, these provisions do not regulate conduct that applies to any ordinary citizen, such as "the mode of turning at the corners of streets[,]" *Johnson*, 254 U.S. at 56-57; they apply exclusively to law enforcement officers, including federal agents, in the performance of their official duties.  As the Ninth Circuit explained, intergovernmental immunity "forbids States from regulating the federal government *qua* government and from controlling federal governmental functions in any manner and to any degree."  *California*, 173 F.4th at 1068.

Another case from the Ninth Circuit, *United States v. City of Arcata*, strongly supports *California*'s characterization of direct regulation.  In *Arcata*, two California municipalities passed ordinances prohibiting the United States military from engaging in activities to recruit minors.

its applicability.  *See id.*  In the present matter, the parties raise pointed arguments which compel the Court to analyze this issue in more detail.

*Arcata*, 629 F.3d at 988.   Military recruiters who violated the ordinances were subject to civil penalties.  *See id.*  The district court permanently enjoined the municipalities from enforcing the ordinances because the ordinances violated intergovernmental immunity.  *See id.* at 988-89.  The Ninth Circuit affirmed, finding the ordinances violated both the regulation and discrimination prongs of the doctrine.  *See id.* at 991-92.  Specifically, the ordinances expressly regulated federal agents (military recruiters) by prohibiting certain conduct—recruiting minors.  *See id.*  The holding in *Arcata* is clear; state laws which expressly attempt to constrain the activities of federal agents in the course of their duties run afoul of the intergovernmental immunity doctrine.

Moreover, *Arcata* supports the proposition that the scope to which federal functions are impeded is not dispositive in a direct regulation analysis.  The military recruiters in *Arcata* were not prevented from performing their jobs entirely.  For example, the ordinances did not prevent recruiting persons over the age of majority.  The extent of the intrusion did not matter; simply "constraining the conduct of federal agents and employees" was direct regulation because the Federal Government "'can act only through its officers and agents[.]'"  *Id.* at 991 (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1879)).

Here too, the Face Covering and Identification Acts likely cannot survive an intergovernmental immunity challenge merely because they do not prevent federal officers and agents from performing every aspect of their job.  These provisions "do not merely regulate the federal government incidentally; rather, they are expressly intended to do so." *Arcata*, 629 F.3d at 991.  Applying that reasoning here, the Face Covering and Identification Acts seek to constrain

24

the conduct of federal law enforcement officers and agents and are, therefore, likely direct regulation.[8]

Defendants' position that *Texas* contradicts the reasoning in *California* is equally misplaced. In *Texas*, there was no state statute at issue; rather, Texas sued DHS, CBP, and federal officials for common law trespass and conversion, as well as violations of Administrative Procedure Act, seeking an injunction preventing DHS from cutting wire fencing that Texas placed along its border with Mexico. *Texas*, 123 F.4th at 193. The Fifth Circuit rejected the Federal Government's state regulation argument because Texas was acting "as a proprietor, not a regulator." *Id.* at 205-06. Further, the Fifth Circuit concluded that Texas had not violated intergovernmental immunity because Texas did not "seek to control how Border Patrol agents carry out their duties." *Id.* at 206-07. As the court observed, Border Patrol officers cut the wire to allow the passage of migrants (not to conduct border enforcement). *Id.*

Thus, in *Texas*, intergovernmental immunity was not violated because Texas was not seeking to control any activity *in furtherance of* federal law enforcement, as the Border Patrol officers did not cut the wire in furtherance of their operations. *See id.* Here, the Face Covering and Identification Acts attempt to regulate the conduct of federal officers and agents *in furtherance* of their enforcement of federal law. Again, the Face Covering and Identification Acts do not "incidentally affect how agents do their jobs," *id.* at 207, they expressly attempt to regulate

---

[8] In the same vein, it does not matter that the Face Covering Act also applies to state and local law enforcement officers because the United States does not challenge these provisions on the theory that New York discriminates against federal officers by treating other law enforcement differently. The United States' challenge to these provisions is solely under the direct regulation prong of intergovernmental immunity, not the discrimination prong. Indeed, "[t]he Supremacy Clause prohibits States from enacting a law that directly regulates federal operations even if the law regulates state operations in the same manner." *California*, 173 F.4th at 1067 (citing *Johnson*, 254 U.S. at 56).

the conduct of federal law enforcement officers "in the performance of their duties," N.Y. Civ. Rights Law §§ 101(a), 102(1).

Defendants also point to *Commonwealth v. Closson*, 229 Mass. 329, 333-34 (1918) and *State v. Ivory*, 906 F.2d 999, 1001-02 (4th Cir. 1990), *see* Dkt. No. 34 at 15, but these cases only galvanize the conclusion that the Face Covering and Identification Acts are likely impermissible regulation of federal activity as opposed to generally applicable laws. In *Closson*, an early twentieth-century case from the highest appellate court in the Commonwealth of Massachusetts, the court determined that because the public roadways were "laid out and maintained by the commonwealth," federal mail carriers were not exempt from obeying local traffic laws. *See Closson*, 229 Mass. at 333-34. Importantly, the state court observed, "[t]he designated streets or ways are not . . . instrumentalities created by the general government, where 'exemption from state control is essential to the independent sovereign authority of the United States within the sphere of their delegated powers.'" *Id.* Were the road "within the sphere of" the power delegated to the Federal Government, the court noted, the mail carrier would not have committed an offense. *See id.* And *Ivory*, a case involving the defense of federal immunity from state prosecution (a notably distinct doctrine from the intergovernmental immunity doctrine at play here), the Fourth Circuit determined that a military driver "was subject to local traffic laws concerning rights of way, speed limits and the like[.]" *Ivory*, 906 F.2d at 1001-02.

The local traffic laws in *Closson* and *Ivory* applied to all drivers on Massachusetts and North Carolina roads—ordinary citizens and federal employees alike. For obvious reasons, the Face Covering and Identification Acts bear far more directly on federal activities than local traffic laws. The Court cannot, on the present record, extrapolate a rule from *Johnson*, *Closson*, *Ivory*,

26

or *Texas* which would likely uphold the Face Covering and Identification Acts under the intergovernmental immunity doctrine.

For these reasons, the Court does not accept Defendants' invitation to disregard *California* as poorly reasoned.

There are also two recent district court decisions that Defendants must contend with: *Virginia*, 2026 WL 1909995 and *Philadelphia*, 2026 WL 1906075.  In both of these cases the district courts found similar face mask and identification requirements imposed by state or local governments violated the Supremacy Clause.  Defendants ask the Court to disregard these decisions too, arguing that *Viriginia* and *Philadelphia* merely repeat the Ninth Circuit's "legally erroneous analysis of the intergovernmental immunity doctrine."  Dkt. No. 34 at 21 and n.9.  As discussed, however, the Court disagrees that the analysis in *California* was erroneous.

In *Virginia*, the district court relied on *California* and *Johnson*, finding that laws containing masking and identification mandates likely "offend[] the principle of intergovernmental immunity" because they require the Federal Government to "satisfy additional requirements placed on them by Virginia . . . which are not required under federal law, and which the federal authorities specifically say they need not meet."  *Virginia*, 2026 WL 1909995, at *10. The Eastern District of Pennsylvania reached the same conclusion in *Philadelphia*.  At issue in *Philadelphia* were bills that imposed criminal penalties against law enforcement officers (including federal officers) for, *inter alia*, wearing "a mask, facial covering, disguise or any other garment that obscures the identity of the law enforcement officer" or "[i]ntentionally obscur[ing], cover[ing], remov[ing] or otherwise conceal[ing] a badge, tag, label or other identifying information required to be visibly displayed."  *Philadelphia*, 2026 WL 1906075, at *9.  The court in *Philadelphia* concluded that the United States demonstrated a likelihood of success on the

27

merits of its Supremacy Clause challenge because the bills impermissibly sought "to 'impose conditions upon a function of government, and regulate the right to carry on the business of the federal government.'" *Id.* (quoting *California*, 173 F.4th at 1067) (cleaned up).

*California*, *Virginia*, and *Philadelphia* are all undoubtably apposite here and Defendants have offered no case where similar laws were upheld in the face of a direct regulation challenge. Accordingly, the Court finds Plaintiff has met its burden of demonstrating that the Face Covering and Identification Acts likely violate the principles of intergovernmental immunity and, thereby, the Supremacy Clause. Defendants' remaining arguments to the contrary are unpersuasive.

Defendants claim that the Face Covering and Identification Acts do not violate the Supremacy Clause because they are a valid exercise of New York's police powers. *See* Dkt. No. 34 at 15-22. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. "Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). "Because these are 'primarily, and historically, . . . matter[s] of local concern,' . . . the 'States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons[.]'" *Id.* (internal citations omitted).

It seems beyond debate that restricting law enforcement officers from wearing masks and requiring visible identification to protect the safety and welfare of the general public is well within New York's police powers. *See Buchanan v. Warley*, 245 U.S. 60, 74 (1917) ("The authority of the state to pass laws in the exercise of the police power, having for their object the promotion of the public health, safety and welfare is very broad"); *see also Gonzales v. Raich*,

28

545 U.S. 1, 42 (2005) (O'Connor, J., dissenting) ("The States' core police powers have always included authority to define criminal law and to protect the health, safety, and welfare of their citizens") (collecting cases).

Nevertheless, whether the Face Covering and Identity Acts are a valid exercise of New York's police powers is beside the point. The Supreme Court has clearly held that "[t]he United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931) (citations omitted).

Article I, Section 1 of the Constitution vests Congress with the "Power . . . to establish a uniform Rule of Naturalization." U.S. Const. art. I § 8 cl.4. Thus, the Supreme Court has recognized that "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. Although the Federal Government "is limited in the number of its powers," states cannot "exclude it from the exercise of any authority conferred upon it by the Constitution, obstruct its authorized officers against its will, or withhold from it, for a moment, the cognizance of any subject which that instrument has committed to it." *Davis*, 100 U.S. at 263. Through the INA, Congress exercised its power to make laws governing the entry, presence, status, and removal of aliens. *See* 8 U.S.C. § 1101, et seq. In addition to providing Executive agencies the authority to inspect, investigate, arrest, detain, and remove persons suspected of being, or found to be, unlawfully in the United States, *see id.* §§ 1182, 1225, 1226, 1227, 1228, 1231, the INA authorizes the Secretary of Homeland Security to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of [the INA]," *id.* § 1103(a)(3). "[N]othing in the

Constitution mentions, or conceives of, a role for the States in implementing or enforcing federal immigration law." *Virginia*, 2026 WL 1909995, at *8.

Defendants may be correct that federal immigration officers wearing masks and not displaying viable identification creates certain dangerous situations that the Face Covering and Identification Acts remedy. "But that argument is addressed to the wisdom of the federal policy. And settled law establishes that federal, not state, authorities make the policies that animate the enforcement of federal immigration laws." *Id.* at *11.

Moreover, Article II of the Constitution vests the President with the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3. And federal law enforcement agencies are creatures of federal law. *See New Mexico v. Musk*, 784 F. Supp. 3d 174, 185 (D.D.C. 2025) ("The Constitution grants Congress the power to create federal offices and agencies. The President shall then appoint individuals to fill such offices, subject to Senate confirmation. And the Judiciary may decide whether the Legislature and Executive acted in accordance with their constitutional prerogatives"). By statute, the heads of federal agencies have the authority to govern their agencies' affairs and direct their agents' activities. *See* 5 U.S.C. § 301 ("The head of an Executive department . . . may prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business . . ."); 28 U.S.C. § 509 ("All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General" with certain exceptions); 8 U.S.C. § 1103 ("[The Secretary of Homeland Security] shall have control, direction, and supervision of all employees . . . [of DHS]").

In sum, an otherwise valid exercise of state police powers may still violate the intergovernmental immunity doctrine if the law at issue regulates these federal functions of law

enforcement directly. *Mayo*, 319 U.S. at 445 ("[T]he activities of the Federal Government are free from regulation by any state. No other adjustment of competing enactments or legal principles is possible") (footnote omitted). Because the Court finds the United States is likely to succeed on its argument that the Face Covering and Identification Acts unlawfully directly regulate the Federal Government, Defendants can find no safe harbor in New York's police powers.

Defendants also contend that federal law enforcement officers are not acting in furtherance of their duties in enforcing federal law by wearing masks because there is no federal law or policy that requires officers to wear masks or refuse to identify themselves. *See* Dkt. No. 34 at 16. This argument sounds in preemption and, as discussed, the United States does not bring a preemption challenge to the Face Covering and Identification Acts. Moreover, the power conferred by Congress to the heads of federal agencies includes the authority and responsibility to determine the uniforms and equipment required in carrying out official duties. *See* 5 U.S.C. § 5901 (requiring the heads of Federal agencies to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 ("It shall be the responsibility of the head of each Federal agency . . . to establish and maintain an effective and comprehensive occupational safety and health program . . . [and] shall . . . acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees"). For the reasons explained, New York cannot impose its own uniform requirements on federal agents simply because it disagrees with how the Federal Government is exercising its authority. *See New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States").

31

Defendants' argument that some federal officers and agents choose not to wear masks likewise miss the mark.  *See* Dkt. No. 34 at 15-17.  The individual choices of some federal officers do not open the floodgates to direct state regulation of federal law enforcement operations and policy.

Defendants also contest whether the United States can bring a facial challenge and note that "this Court has recognized, '[q]uestions about how [a state law] would apply in particular situations, and whether federal officials may be immune from liability in certain cases . . . do not render the statute facially invalid.'"  *Id.* at 18 (quoting *United States v. New York*, 810 F. Supp. 3d 329, 348 n.7 (N.D.N.Y. 2025)).  But, at this time, there are no questions about how the Face Covering and Identification Acts would apply; Defendants do not dispute that these provisions presently subject federal law enforcement to criminal penalties for non-compliance.

Indeed, Defendants admit elsewhere in their briefing that whether federal officials may be immune from liability in a criminal proceeding brought pursuant to these provisions is not relevant to the United States' facial challenge.  *See* Dkt. No. 34 at 17 (citing *United States v. Tanella*, 374 F.3d 141, 148-49 (2d Cir. 2004)); *see California*, 173 F.4th at 1068 (finding the standard governing criminal prosecution of federal officers, which asks "'whether the [officer's] conduct was necessary and proper under the circumstances[,]' . . . is inapplicable here because [the challenged law] directly regulates inherently governmental conduct of federal officers carrying out their duties under federal authority") (citation and emphasis omitted).  Even the Central District of California, which would have upheld similar state laws, recognized that "the challenged Acts are each subject to facial challenges as potentially violating the intergovernmental immunity doctrine, irrespective of whether Supremacy Clause immunity would

bar state prosecutions of federal officers for violating the Acts in only some or in all circumstances." *California*, 819 F. Supp. 3d at 1122.

Finally, Defendants take issue with "Plaintiff's assertion that face coverings are 'necessary' to the performance of the official duties of federal law enforcement officers." *Id.* at 16-17 (citing Dkt. No. 1 at ¶¶ 95, 99). However, as the Ninth Circuit noted, "if a state law directly regulates the conduct of the United States, *it is void irrespective of whether the regulated activities are essential to federal functions or operations*, and irrespective of the degree to which the state law interferes with federal functions or operations." *California*, 173 F.4th at 1067 (emphasis added).

In sum, matters of federal law enforcement, including immigration enforcement, are within the powers of the Federal Government. As these powers were not left to the States, Defendants' arguments, which primarily sound in the Tenth Amendment, are unpersuasive at this juncture. *See Virginia*, 2026 WL 1909995, at *7 ("[T]he policy choice belongs to the federal government, not to [the state]. And, [the state's] police power cannot supplant the federal choice"). Because the Face Covering and Identification Acts take direct aim at regulating the federal agents in their function of enforcing federal law, the Court finds these provisions likely run afoul of the intergovernmental immunity doctrine. The Court, therefore, finds the United States is likely to succeed on the merits of Claim One.[9]

### 2. Intergovernmental Immunity and Preemption—Claims Two, Three, and Five

The United States also challenges the Termination Act on Supremacy Clause grounds, arguing that the provision unlawfully regulates and discriminates against the Federal Government,

---

[9] The Court has carefully considered the parties' arguments and has not come to this conclusion flippantly. As the Supreme Court has recognized, "[m]any constitutional standards involve 'undoubte[d] . . . gray areas[.]'" *Garcia*, 469 U.S. at 540 (quoting *Fry v. United States,* 421 U.S. 542, 558 (1975) (Rehnquist, C.J. dissenting)). The intergovernmental immunity doctrine is no exception.

and unlawfully creates an obstacle to the enforcement of federal law.  *See* Dkt. No. 4-1 at 22-25, 27-28.  The Court disagrees.

As explained below, Defendants are correct that *McHenry County v. Kwame Raoul*, 44 F.4th 581 (7th Cir. 2022) casts significant doubt on the strength of Plaintiff's preemption and intergovernmental immunity claims challenging the Termination Act.  Dkt. No. 34 at 22-26.  Moreover, caselaw from the Fifth Circuit and the District of New Jersey clarify why a state's choice to decline participation in the voluntary cooperation contemplated by § 1357(g) does not run afoul of preemption or intergovernmental immunity.

### i.  Conflict Preemption

Plaintiff alleges that the Termination Act is conflict preempted.  *See* Dkt. No. 1 at ¶¶ 129-33, 153.  Conflict preemption occurs where state "law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives."  *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (citation omitted).  "Under the Supremacy Clause of the Constitution, state and local laws that conflict with federal law are 'without effect.'"  *Id.* at 103-04 (citation omitted).

In *City of El Cenizo v. Texas*, the Fifth Circuit upheld a Texas law that forbade local entities from taking any action that would "'prohibit or materially limit' a specified official from 'assisting or cooperating with a federal immigration officer as reasonable or necessary, including providing enforcement assistance.'"  *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (quoting Tex. Gov't Code § 752.053(b)(3)).  In so holding, the Fifth Circuit rejected the argument that this law was preempted by § 1357(g).  *See id.* at 176-82.  As the court explained,

> [f]ederal law does not suggest the intent—let alone a "clear and manifest" one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement.  Section 1357 does

> not require cooperation at all . . . .  And the savings clause allowing
> cooperation without a 287(g) [A]greement indicates that some state
> and local regulation of cooperation is permissible.

*Id.* at 178 (5th Cir. 2018) (citing 8 U.S.C § 1357(g)(9)-(10)) (internal citation omitted) (emphasis in original).  "[U]nder the Tenth Amendment, Congress could not compel local entities to enforce immigration law." *Id.* at 180-81.  Indeed, Section 1357 explicitly states that "nothing in [subsection (g)] shall be construed to require any State or political subdivision of a State to enter into [a 287(g) Agreement]"  8 U.S.C. § 1357(g)(9); *see City of El Cenizo*, 890 F.3d at 181 ("Congress . . . could not have made [Section 1357] mandatory").

Relying on *City of El Cenizo*, the District of New Jersey has also found that a New Jersey law prohibiting 287(g) Agreements between the United States and New Jersey state, county, and local law enforcement agencies was not preempted.  *See Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 383 (D.N.J. 2020), *aff'd sub nom.*, 8 F.4th 176 (3d Cir. 2021).  As the District of New Jersey explained, "[t]he INA itself contemplates that State law governs whether a subdivision can cooperate with enforcement of federal immigration law through a 287(g) [A]greement.  That comports with the State of New Jersey's well-established police power to regulate and control its own law enforcement agencies." *Id.*  "The Court must presume that such police powers are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Arizona*, 567 U.S. at 400).  Thus, "[w]hile 287(g) [A]greements may facilitate the federal government's enforcement of immigration laws, and perhaps, the federal government may in fact benefit from such assistance from local authorities," a state law that prohibits "localities from entering into such agreements does not create any obstacle to that enforcement." *Id.*

Indeed, as this Court recently recognized, § 1357(g) "gives the States and local governments the option to enter into agreements with federal immigration officials to assist with

35

immigration enforcement." *New York*, 810 F. Supp. 3d at 350. As such, courts "have consistently found that . . . state and local policies[] which withhold state cooperation for federal immigration enforcement activities[] are not preempted by [§ 1357]." *Id.* (collecting cases).

Here, the Court reaches the same conclusion. Plaintiff is correct that Congress may have "contemplated cooperation" between federal, state, and local authorities in enacting § 1357(g). *See* Dkt. No. 1 at ¶¶ 130-31. But New York is "not bound by that hope or expectation." *McHenry Cnty.*, 44 F.4th at 592. "It would make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation." *Id.*

Accordingly, the Court finds the United States has failed to demonstrate a likelihood of success of the merits of Claim Five.

### ii. Intergovernmental Immunity

As for unlawful regulation in violation of the Supremacy Clause, this Court finds additional support in *Grewal*. There, the District of New Jersey also explained that a state law which prohibits localities from entering into 287(g) Agreements "does not regulate the United States directly; it regulates only the conduct of state and local law enforcement agencies in the" state. *Grewal*, 475 F. Supp. 3d at 385. This understanding of the doctrine is consistent with the Court's analysis regarding the Face Covering and Identification Acts. In those provisions, New York seeks to directly control how the Federal Government carries out its enforcement of federal law. On the other hand, the Termination Act seeks only to control whether New York and its localities voluntarily engage in certain cooperation with federal authorities.

The United States has also failed to show, at this stage, that the Termination Act likely discriminates against the Federal Government. A state law discriminates against the United States when it "treats similarly situated state and federal [actors] differently" in a way that cannot

36

be explained by "significant differences[s]" between the two. *Dawson v. Steager*, 586 U.S. 171, 177 (2019) (citations and internal quotation marks omitted).

First, to the extent the United States alleges that the Termination Act interferes with Congress' inherent authority to regulate federal immigration law, *See* Dkt. No. 4-1 at 24, "the mere fact that the [state law] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cnty.*, 44 F.4th at 594.

Second, the United States claims that it need not identify a comparator to establish discrimination, relying on *United States v. King Cnty.*, 122 F.4th 740 (9th Cir. 2024). *See* Dkt. No. 38 at 15. But as this Court has recounted in a previous case, "a comparator is necessary." *New York*, 810 F. Supp. 3d at 353. Moreover, *King County* is readily distinguishable. There, the Ninth Circuit determined that an executive order "'explicitly treat[ed]' contractors who serve ICE charter flights 'differently' from those who do not" because the executive order permitted those contractors to use the space they leased from an airport "for any purpose other than servicing flights 'engaged in the business of deporting immigration detainees.'" *King Cnty.*, 122 F.4th at 757. The Ninth Circuit reasoned that "the only entity in the business, so to speak, of deporting immigration detainees, is the federal government." *Id.*

But, for purposes of governmental immunity, "the State does not discriminate against the Federal Government . . . unless it treats someone else better than it treats them." *Washington*, 460 U.S. at 544-45. In *King County*, certain operators were singled out for unfavorable treatment specifically because they serviced ICE charter flights. Those operators who did not contract with ICE were treated differently. Thus, *King County* did, in fact, use a comparator in determining whether the executive order unlawfully discriminated against the Federal Government. The United States' suggestion that this case alleviates the comparator requirement, therefore, falls flat.

37

Nevertheless, the United States does attempt to identify a comparator. *See* Dkt. No. 1 at ¶ 116. According to the United States, the Termination Act discriminates against the Federal Government "by solely preventing the Federal Government and local agencies from creating 287(g) Agreements for civil immigration enforcement," while "state and local government[] offices and municipalities are not barred from forming agreements to facilitate the detention of individuals for non-immigration purposes and with other entities." Dkt. No. 4-1 at 24. This mischaracterizes the Termination Act. Section 170-k applies only to assistance with immigration enforcement and detention services. *See* N.Y. Exec. Law § 170-k(2). As such, the federal government (along with New York and local government entities) remains free to participate in intergovernmental cooperation for other enforcement or detention services unrelated to immigration. "The State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government." *McHenry Cnty.*, 44 F.4th at 594 n.7.

For these reasons, the Court finds the United States has not met its burden of demonstrating a likelihood of success on the merits of Claims Two and Three.

### 3. The Contracts Clause—Claim Four

The Contracts Clause prohibits states from passing any laws "impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. "Although the language of the Contract[s] Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 434 (1934)).

38

The Supreme Court has articulated a three-inquiry test relevant to determining whether a state law violates the Contracts Clause.  "The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'"  *Id.* at 411 (citation omitted).  Next, "[i]f the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, . . . such as the remedying of a broad and general social or economic problem."  *Id.* at 411-12 (citations omitted).  Finally, "[o]nce a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'"  *Id.* at 412.

The boundaries of the Contracts Clause have evolved over time.  After conducting a thorough analysis of this evolution throughout the course of two centuries of Supreme Court jurisprudence, the Second Circuit recently summarized as follows:

> Critics have suggested that unpredictability is inherent in a Contracts Clause standard that relies on balancing.  Whether or not such criticism is warranted, we have reviewed the evolution of the Court's Contracts Clause jurisprudence in such detail in order faithfully to apply here the constitutional limits as presently recognized by the Supreme Court.  That review indicates that the Clause's limits may no longer be defined with the firmness and clarity pronounced in [*Green v. Biddle*, 21 U.S. 1 (1823)] and cases of that era.  Rather, the Clause's textual prohibition is now understood to demand some flexibility to allow states to protect the public welfare as explained in *Blaisdell*.  Nevertheless, the Clause's limits are not illusory or non-existent.  As recognized in [*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978)], the Clause continues to afford individuals the right to use contracts to order their affairs and to rely thereon except as warranted by a significant and legitimate public purpose pursued through reasonable and appropriate means.  That standard is more demanding than the rational basis review that applies when legislation is challenged under the Due Process Clause.  But it is more deferential to

> legislative judgment than strict scrutiny, particularly when the impaired contract at issue is private and state self-interest is not an obvious concern. It is a standard that depends on balancing to ensure that Contracts Clause limitations both "do not destroy the reserved power" of the states "in its essential aspects," and that the reserved power of the states does not "destroy the limitations" of the Contracts Clause.

*Melendez v. City of New York*, 16 F.4th 992, 1032 (2d Cir. 2021) (quoting *Blaisdell*, 290 U.S. at 437) (citations omitted).

The United States argues that the Termination Act violates the Contracts Clause because it terminates all 287(g) Agreements in the state of New York and lacks a significant or legitimate purpose. *See* Dkt. No. 4-1 at 25-27. Defendants contend that, even assuming the Termination Act causes "substantial impairment" of contracts, it does not violate the Contracts Clause because it is a valid exercise of the State's police power and choice not to participate in federal immigration enforcement. *See* Dkt. No. 34 at 26-27.[10]

According to Defendants, the Termination Act "reflect[s] the State's longstanding policy choice to prioritize the use of state and local resources on state and local issues rather than federal civil immigration enforcement." Dkt. No. 34 at 12 (citing N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170 (2017) (executive order directing state officials to refrain from participating in federal civil immigration enforcement)). Defendants also rely on a Governor's Program Bill Memorandum, which was submitted in support of the Challenged Acts, and states that the Termination Act seeks "to address the State's concerns that the 'use of local law enforcement officers and assets for the enforcement of federal civil immigration violations . . . draws critical public safety resources away from essential law enforcement functions that keep New York's residents and communities

---

[10] At this stage, Defendants do not contest the "substantial impairment" prong and, therefore, the Court considers it satisfied for purposes of this Memorandum-Decision and Order.

safe.'" *Id.* (quoting Governor's Program Bill Memorandum No. 18 for A.B. 10005/S.B. 9005 at 2, https://www.governor.ny.gov/sites/default/files/2026-01/gpb_18-local_cops_local_crimes_act-memo.pdf) (last visited July 27, 2026)).[11]

In its reply briefing, the United States argues that the stated purpose in the Termination Act is to "'protect the rights of New Yorkers with respect to civil immigration enforcement by the federal government.'" Dkt. No. 38 at 16 (quoting 2026 N.Y. Sess. Law ch. 55, pt. LL § 1). This purpose, according to the United States, is not legitimate because 287(g) Agreements "do not implicate the rights of New Yorkers." *Id.* Further, the United States contends that Defendants' "post hoc" justification of conserving state and local law enforcement resources has no support in the law itself and deserves no consideration. *See id.*

### i. Significant and Legitimate Public Purpose

The record presently before the Court demonstrates a significant and legitimate public purpose underlying the Termination Act.[12] The United States' arguments to the contrary are unpersuasive.

First, the Court disagrees with the United States' assertion that Defendants' justification for the Termination Act is post hoc. *See id.* The Governor's Program Bill Memorandum, cited by Defendants in their opposition brief, is part of the legislative history of the Termination Act and explicitly describes the justification for the provisions as follows:

> Current federal immigration efforts have made communities less safe, leading to the loss of innocent lives, including those of U.S. citizens. The use of local law enforcement officers and assets for the enforcement of federal civil immigration violations in

---

[11] The Court will hereinafter cite and refer to this document as the "Governor's Program Bill Memorandum."

[12] Although, as discussed, New York's police powers likely cannot overcome an intergovernmental immunity challenge, a Contracts Clause challenge takes into consideration a state's legitimate public purpose.

furtherance of the federal administration's immigration agenda draws critical public safety resources away from essential law enforcement functions that keep New York's residents and communities safe.

Governor's Program Bill Memorandum at 2.  The United States cites *Equip. Mfrs. Inst. v. Janklow*, *see* Dkt. No. 38 at 17, where the Eighth Circuit rejected a post hoc articulation of the significant and legitimate public purpose of a challenged law, noting "[t]here is no statement of legislative intent or any other legislative history from which to directly ascertain the purpose of the Act[,]" *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 860 (8th Cir. 2002).  However, here, the Governor's Program Bill Memorandum was submitted in support of the Termination Act and explicitly contains Governor Hochul's justifications therefor.

Second, in asking that the Court weigh the propriety of New York's exercise of its police powers, the United States misapprehends the significant and legitimate public purpose requirement.  A legitimate public purpose is one "'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.'"  *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) (citation omitted).

As the Supreme Court has explained, "[t]he requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests."  *Energy Rsrvs.*, 459 U.S. at 412.  The Court then provided an example in a footnote:

> In *Allied Structural Steel Co. v. Spannaus*, the Court held that the Minnesota pension law severely impaired established contractual relations between employers and employees.  The State had not acted to meet an important general social problem.  The pension statute had a very narrow focus: it was aimed at specific employers.  Indeed, it even may have been directed at one particular employer planning to terminate its pension plan when its collective-bargaining agreement expired.

42

*Id.* at 412 n.13 (citing *Spannaus*, 438 U.S. at 247-48 & n.20).  Thus, an exercise of police powers absent any indication of benefits to special interests ends the inquiry.  *See Blaisdell*, 290 U.S. at 447-48 ("Whether the legislation is wise or unwise as a matter of public policy is a question with which we are not concerned")

There is no indication that special interests are at play here.  Instead, the Termination Act is an exercise of New York's police powers, aimed at protecting public safety and local law enforcement resources.  This legislation was "passed in the service of 'a broad societal goal, not the pursuit of the interests of a narrow class'" and, therefore, appears to satisfy the legitimate public purpose prong.  *See Conn. State Police Union v. Rovella*, 36 F.4th 54, 66-67 (2d Cir. 2022).   (citation omitted).

### *ii.  Reasonableness and Necessity*

Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *U.S. Tr. Co. v. New Jersey*, 431 U.S. 1, 22 (1977*)*.  "Unless the state itself is a party to the contract, courts usually defer to a legislature's determination as to whether a particular law was reasonable and necessary." *Buffalo Tchrs.*, 464 F.3d at 369 (citing *Energy Reserves*, 459 U.S. at 412-13).  The United States contends that the Termination Act is not entitled to deference because New York is attempting the terminate its own contracts.  *See* Dkt. No. 38 at 17.[13]

---

[13]  The United States does not allege that New York State itself has entered into any 287(g) Agreements.  Instead, counties and local municipalities have done so.  *See* Dkt. No. 1 at ¶ 57. The United States has provided the fourteen 287(g) Agreements entered into by local agencies as attached as exhibits to the declaration of Bryan Flanagan, Assistant Field Office Director, ICE, Enforcement and Removal Operations, New York City Field Office.  *See* Dkt. Nos. 4-7, 4-8, 4-9, 4-10, 4-11, 4-12, 4-13, 4-14, 4-15, 4-16, 4-17, 4-18, 4-19, 4-20.  Nevertheless, the Court will

"Under the *Buffalo Teachers* 'less deference' standard, [courts] look first to whether the contract impaired is public or private." *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 65-66 (2d Cir. 2020). If the contract impaired is public, courts then "ask whether there is 'some indicia' that the state impaired the contract out of its own self-interest." *Id.* (quoting *Buffalo Tchrs.*, 464 F.3d at 369-70). If there is "some indicia" that the state impaired the contract out of its own self-interest, then "less deference" scrutiny applies and "it must be shown that the state did not (1) consider impairing the . . . contracts on par with other policy alternatives or (2) impose a drastic impairment when an evident and more moderate course would serve its purpose equally well, nor (3) act unreasonably in light of the surrounding circumstances." *Id.* at 66 (citation and internal quotation marks omitted). "These factors amount to a requirement that the state acted both reasonably and out of necessity." *Id.* at 66. As the Second Circuit summarized:

> The key to all this—we repeat—is to determine whether the state in breaching a contract is acting like a private party who reneges to get out of a bad deal, or is governing, which justifies its impairing the plaintiffs' contracts in the public interest. It was with this in mind that in *Buffalo Teachers* we developed and applied a 'less deference' standard.

*Id.* at 65.

In applying the "less deference" standard, courts must examine the record for "evidence that the state's self-interest rather than the general welfare of the public motivated the state's conduct." *Buffalo Tchrs.*, 464 F.3d at 365. "On this issue, plaintiffs have the burden of proof because the record of what and why the state has acted is laid out in committee hearings, public reports, and legislation, making what motivated the state not difficult to discern." *Id.*

---

entertain the United States' argument that the Termination Act is not entitled to the deference typically afforded to legislative determinations regarding reasonableness and necessity.

To meet its burden, a plaintiff must show that the state is "[reneging] on its obligations" and "altering the contract for its own benefit." *Sullivan*, 959 F.3d at 66 (citation and internal quotation marks omitted). "Reneging is, at its core, about impairments imposed to benefit the state financially, or as a matter of political expediency." *Id.* "Evidence showing indicia of reneging may take many forms[,]" such as (1) "evidence that the contractual impairment was chosen when other politically unpopular alternatives were available"; (2) "evidence that the contractual impairment is a response to a well-known, long-standing, problem, as opposed to a change in circumstances"; or (3) "evidence that the law took aim at a narrow class of individuals when its purported goals could be served equally by spreading the necessary sacrifice throughout a broader, and perhaps more politically powerful, base." *Id.* at 66-67 (citations and internal quotation marks omitted). In sum, "'less deference' scrutiny applies only when the plaintiff has put forward some evidence tending to show that the government has engaged in reneging instead of 'genuinely acting for the public good.'" *Id.* at 66 (quoting *Buffalo Tchrs.*, 464 F.3d at 370).

At the present juncture, the United States has failed to present any evidence which suggests the Termination Act was self-serving reneging. "If there is no indication 'that the state impaired the contract out of its own self-interest,'" then the Court may "defer to the State's assessment of the reasonableness and necessity of the law in question." *Rovella*, 36 F.4th at 66-67 (citation omitted).

"[This] deference is not blind, however; it can be overcome by *compelling evidence* from plaintiffs that the State's actions were either unreasonable or unnecessary." *Id.* at 67 (emphasis added). To this end, the United States offers merely a single conclusory statement: "[t]he Termination Act's invalidation of all existing and future agreements is far from reasonable and appropriate to address any purported public purpose justifying its enactment." Dkt. No. 4-1 at 27.

The Second Circuit has not elaborated as what would constitute "compelling evidence" in these circumstances.  But the United States' conclusory statement is not evidence, let alone compelling evidence.  *See Convergen Energy WI, LLC v. L'Anse Warden Elec. Co., LLC*, No. 20-CV-5240, 2020 WL 5894079, \*5 (S.D.N.Y. Oct. 5, 2020) ("'[C]onclusory allegations lacking supporting evidence will not support a preliminary injunction'") (quoting *Crichlow v. Fischer*, 2015 WL 678725, \*8 (S.D.N.Y. Feb. 17, 2015)).

Because the United States has not met its burden of showing self-interested reneging or compelling evidence that the Termination Act is unreasonable or unnecessary, the Court defers to Defendants' determination that the Termination Act is an appropriate means of furthering New York's legitimate interests in protecting public welfare and choosing how state and local resources are expended.  *See Rovella*, 36 F.4th at 66 ("[I]n the absence of 'self-serving, privately motivated, action' on behalf of the State, courts may presume that the 'passed law is valid and done in the public interest'") (quoting *Sullivan*, 959 F.3d at 66) (footnote omitted).  Accordingly, the Court finds Plaintiff has failed to establish that it is likely to succeed on the merits of Claim Four.

## C.    Irreparable Harm

The Court has found that the United States has demonstrated a likelihood of success on the merits of only its intergovernmental immunity challenge to the Face Covering and Identification Acts.  Thus, the Court's analysis continues only with regard to Claim One and the United States is not entitled to preliminary injunctive relief on its other claims.

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *State Farm Mut. Auto. Ins.*, 120 F.4th at 80 (citations and internal quotation marks omitted).  "To establish irreparable harm, the moving party must show an 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an

46

award of monetary damages.'"  *St. Joseph's Hosp. Health Ctr.*, 131 F.4th at 106 (quoting *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020)).  Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied."  *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (citations omitted).

As the Southern District of New York recently recognized, although "'the mere "assertion of constitutional injury is insufficient to automatically trigger a finding of irreparable harm,"'" *Seventh Regiment Armory Conservancy, Inc. v. Knight*, 811 F. Supp. 3d 467, 477-78 (S.D.N.Y. 2025) (citation omitted), if the alleged constitutional deprivation is "'convincingly shown[,]'" the irreparable harm prong is satisfied, *id.* (quoting *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150, 152 (E.D.N.Y. 2012)).  In other words, "[w]hile the assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable harm, . . . where, . . . the constitutional deprivation is convincingly shown and that violation carries noncompensable damages, a finding of irreparable harm is warranted."  *Donohue*, 886 F. Supp. 2d at 150 (citations omitted). "Accordingly, when a constitutional violation is alleged, 'the two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of success on the merits.'" *Knight*, 811 F. Supp. 3d at 478 (quoting *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000)).

In light of the Court's finding that the United States has met its burden of establishing a likelihood of success on the merits of its Supremacy Clause challenge to the Face Covering and

Identification Acts, "the imminent harm prong of the analysis is satisfied." *Donohue*, 886 F.

Supp. 2d at 150.[14]

**D.      Public Interest and Balance of Equities**

Finally, the Court must determine whether "the balance of equities tips in [Plaintiff's]

favor" and whether "an injunction is in the public interest." *New York Progress & Prot. PAC v.

Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

7, 20 (2008)) (internal quotation marks omitted).  "When the government is a party to the suit,

[the] inquiries into the public interest and the balance of the equities merge." *We The Patriots

USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021), *opinion clarified*, 17 F.4th 368 (2d Cir.

2021) (citation omitted).

The United States argues that the final merged factors weigh in favor of a preliminary

injunction because there is no public interest in Defendants' enforcement of laws which likely

violate the Supremacy Clause.  *See* Dkt. No. 4-1 at 32-33; Dkt. No. 38 at 20.  Further, the United

States contends that (1) the Face Covering and Identification Acts chill effective enforcement of

federal law, Dkt. No. 4-1 at 32-33; (2) protecting the safety of federal law enforcement officers is

"well within the public interest[,]" *id.*; and (3) "placing federal, state, and local law enforcement at

odds with one another . . . could lead to dangerous confrontations between officers[,]" Dkt. No. 38

at 20.

---

[14]  The risk of irreparable harm appears to be particularly imminent given that the Face Covering
and Identification Acts would subject federal law enforcement officers to criminal penalties.  *C.f.
Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (noting that courts may enjoin
state officers "'who threaten and are about to commence proceedings, either of a civil or criminal
nature, to enforce against parties affected an unconstitutional act, violating the Federal
Constitution'") (quoting *Ex parte Young,* 209 U.S. 123, 156 (1908)).

Defendants argue that the balance of equities and public interest weigh against enjoining the Face Covering and Identification Acts because these provisions were enacted to promote public safety, transparency, and accountability.  *See* Dkt. No. 34 at 30.  Defendants also contend that "the effect of masked federal agents 'snatching' individuals off the streets has 'terrorize[d]' communities" and "[t]he State is not required to ignore these unwarranted federal intrusions on its sovereign duty to protect its residents."  *Id.* (citations omitted).  Additionally, Defendants stress the lack of federal law or policy "requiring federal law enforcement officers to conceal their identities or their law enforcement affiliations" and that the United States' claims regarding federal officer safety are "questionable" should both weigh against the imposition of preliminary injunctive relief.  *Id.* at 31.

Defendants' perspective is grounded in unavoidable observations of recent troubling events which loom darkly over the public perception of the manner in which federal immigration law is enforced.  New York appears to be well-intentioned in its pursuit of transparent policing.  And *amicus curae* Citizens for Responsibility and Ethics in Washington may be correct that the Face Covering and Identification Acts support transparency and safety.  *See generally*, Dkt. No. 31-1.  However, the issue now before the Court is about constitutionality—not transparency or preferable policy decisions.  There is a constitutional proscription on direct state regulation of federal agency operations.  Whether federal law enforcement agencies have chosen to carry out such operations in a sufficiently transparent manner is an important question.  But that question is not for this Court to answer at the present time.

"'As with irreparable injury, when a plaintiff establishes "a likelihood that [challenged] policy violates the U.S. Constitution, [the p]laintiff[] [has] also established that both the public interest and the balance of the equities favor a preliminary injunction."'"  *J.S.R. by & through*

*J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 743 (D. Conn. 2018) (quoting *Ms. L. v. U.S. Immigr. & Customs Enf't ("ICE")*, 310 F. Supp. 3d 1133, 1147 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019)).  "Courts routinely find that 'the public interest [is] not served by the enforcement of an unconstitutional law.'" *Philadelphia*, 2026 WL 1906075, at *14 (quoting *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 389 (3d Cir. 2012), and then collecting cases).  Indeed, as this Court has recognized, "a state is 'in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.'" *Millennium Pipeline Co., L.L.C. v. Seggos*, 288 F. Supp. 3d 530, 545 (N.D.N.Y. 2017) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)).

As discussed above, the United States has demonstrated a likelihood that it will succeed on its claim that the Face Covering and Identification Acts directly regulate federal officers in violation of the Supremacy Clause, "so there can be no public interest in enforcing those provisions against the [F]ederal [G]overnment, notwithstanding the motivations that may have spurred their adoption." *Philadelphia*, 2026 WL 1906075, at *14.  Stated differently, "[b]ecause the United States has shown a likelihood that the [Face Covering and Identification Acts] violate[] the Supremacy Clause, it has also shown that both the public interest and balance of the equities tip" the scale in favor of granting the request for a preliminary injunction.  *California*, 173 F.4th at 1069 (citations omitted).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the United States' motion for preliminary injunction is **GRANTED in part and DENIED in part** as set forth herein; and the Court further

**ORDERS** that Defendants and their successors, agents, and employees are hereby preliminarily enjoined from enforcing New York Civil Rights Law § 101 (the "Face Covering Act") and New York Civil Rights Law § 102 (the "Identification Act");[15] and the Court further

**ORDERS** that this preliminary injunction shall remain in full force and effect until entry of a final judgment on the merits, unless otherwise subsequently ordered; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  August 3, 2026
       Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge

---

[15]  For the reasons herein, the Court finds that the United States has not demonstrated a likelihood of success on the merits of its claims challenging New York Executive Law § 170-k (the "Termination Act").  Thus, the United States' motion is denied to the extent it seeks a preliminary injunction enjoining the enforcement of the Termination Act.